SCRANTON CONSTRUCTION COMPA-
NY, INC., and Clegg Concrete, Inc.,
Plaintiffs-Appellants,

v.

LITTON INDUSTRIES LEASING COR-
PORATION et al., Defendants-
Appellees.

No. 73–1980.

United States Court of Appeals,
Fifth Circuit.

May 31, 1974.

Rehearing and Rehearing En Banc
Denied June 25, 1974.

Norman L. Breland, Boyce Holleman, Gulfport, Miss., for plaintiffs-appellants.

William T. Jones, John M. Grower, Jackson, Miss., for United Cement.

Charles E. Foster, Beverly Hills, Cal., Karl Wiesenburg, Pascagoula, Miss., Edward E. Vaill, Beverly Hills, Cal., for Litton Systems, Inc.

Before COLEMAN, CLARK and GEE, Circuit Judges.

GEE, Circuit Judge:

Plaintiffs-appellants' federal antitrust suit, with joined state-law claims, was terminated by summary judgment. We affirm.

Plaintiffs are Mississippi and Louisiana corporations which sought, as joint venturers, the ready-mix concrete subcontract involved in the construction of a shipyard in Pascagoula, Mississippi.

In 1967, Defendant Litton Systems, Inc. (Litton), by its wholly owned subsidiary,[1] agreed with the State of Mississippi to build a large [2] shipyard at Pascagoula for the state. Litton hired Defendant Ralph M. Parsons, Inc. (Parsons), a Nevada corporation qualified in

---

1. Ingalls Shipbuilding Corporation.

2. Financed by $130,000,000 of Mississippi State Bonds.

Mississippi, to be a sort of general construction superintendent[3] at a fixed fee, but reserved to Litton the award and method of award of the ready-mix subcontract and all others of financial significance. Litton's contract with Mississippi and Parsons' contract with Litton both contained "Buy Mississippi" preference clauses.

In due course, Parsons solicited quotes for 300,000 yards of ready-mix concrete, specifically reserving the rights to reject any and all bids and to furnish to the winner cement, sand and aggregate at its discretion. The bid evaluation committee, composed of two Litton men and one from Parsons, found plaintiffs' bid lowest and best and recommended its acceptance. Litton, however, exercised its prerogative and required rebids by plaintiffs and the second lowest bidder, a venture composed of two Mississippi concerns. These produced a second low bid by plaintiffs and a second recommendation by the committee that plaintiffs receive the work. Litton, however, again rejected all bids and thickened the plot by introducing to it the third and last defendant, United Cement Company, Inc. (United).

United, the wholly owned Mississippi subsidiary of a Texas corporation, was the child of its General Manager Reese's dream of developing the vast Selma Chalk deposits in Northeast Mississippi for portland cement production. Reese had long coveted the subcontract in question and had supported the shipyard project and taken other appropriate measures with this in mind. Among his recommendations for the job was one of peculiar quality: he had earned Litton's gratitude by refusing to submit to a bid-rigging and kickback scheme operating among Litton's lower echelons and had courageously exposed it to top management and aided in its extirpation.[4] Consistent with Mississippi preference, out of gratitude for Reese's commendable action, and pursuant to an understanding that Reese would be given a "fair shot" at the cement contract,[5] Litton arranged a meeting between Reese and the two low bidders so that Reese could quote each "a special low price" for cement to enable him to reduce his bid on the ready-mix. This was, and was known to Reese and Litton beforehand to be, a farce: Reese merely quoted to each bidder the cement price[6] which he had already stated in his last bid, having been warned by his counsel that to do otherwise would be to alter their competitive status and violate the antitrust laws. Litton had pressed Reese to "cross-reference" the prices, but Reese refused to do so, fearing suit. Plaintiffs assert that this rather curious procedure established United as a "sole supplier," and we so assume for summary judgment purposes. At any rate, after the Reese conference plaintiffs agreed to use only United's cement if awarded the contract, and the competitor agreed to use half of it.[7]

In the ensuing third round of bids, plaintiffs quoted $11.67 per cubic yard. But the next day Litton handed the competitor a slip of paper on which was written "$11.62." The competitor took this to be plaintiffs' bid, bid $11.61, and received the contract. A later, lower bid by plaintiffs was rejected by Litton, and this suit followed.

---

3. Though denominated "general contractor or subcontractor." In the course of this appeal, Parsons was dismissed as a defendant. Since it is undisputed that Litton had reserved to itself all power over the award of the contract in question, no room exists for a contention of conspiracy with Parsons affecting the award.

4. It seems regrettable, though irrelevant, that all Mr. Reese's vision and fortitude in the premises produced for his concern was a lawsuit.

5. In exchange for Reese's promise that a Litton subsidiary would have a "fair shot" at building United's plant. In the event, both "fair shots" were clean misses.

6. Plaintiffs were quoting $3.37 net per barrel as the cement price on which their bid was based, their competition $3.01. Neither knew the other's price.

7. In the end the competitor found a better price and bought none of it.

Discovery in the case has been extensive and exhaustive; and it, together with unrefuted affidavits, establishes further particular facts which we will notice at appropriate points. We note at the outset that we are not called upon to, and do not, consider or pass judgment on Litton's business ethics. Our concern is with other issues. Two defendants—Litton and United—remain actively before us, plaintiffs having dismissed Parsons and conceded that another, Litton Industries Leasing Corporation was erroneously sued.

Plaintiffs' Sherman Act and Clayton, Robinson-Patman Act claims against Litton and United proceed upon four actions and inferences of conspiracy based upon them: (1) the repeated rebidding required by Litton, (2) designation of United by Litton as the "sole source" of cement, (3) United's offer of different prices to the two competing bidders, and (4) the inducement of an artifically low bid from plaintiffs' competitor by causeing it to believe plaintiffs' bid was $11.62 when in fact it was $11.67. Before taking up the merits of these claims, we consider subject-matter jurisdiction.

### Jurisdiction

■■ The court below concluded, in its careful and wide-ranging opinion that it lacked jurisdiction under both the Clayton, Robinson-Patman Act and the Sherman Act. Bearing in mind the deservedly high mortality rate of summary dispositions of such litigation as this,[8] and the disfavor with which such dispositions are viewed,[9] we conclude that plaintiffs show arguable jurisdiction under the Sherman Act, stemming from the magnitude of the intrastate ready-mix sale and its close nexus to the construction of the shipyard, a massive instrumentality of interstate and foreign commerce—a showing sufficient, at any rate, to make us unwilling to dispose of those claims on jurisdictional grounds. As to Clayton, Robinson-Patman, however, plaintiffs clearly fall short.

■ They properly concede that their competitor's only sale of concrete here involved was entirely intrastate;[10] though ingredients which had travelled interstate, such as cement, were involved, ". . . all the interstate ingredients were mixed together within the confines of Pascagoula, Mississippi, and delivered to Litton there." This is fatal. Littlejohn v. Shell Oil Co., 483 F.2d 1140 (5th Cir. 1973); Hiram Walker, Inc. v. A & S Tropical, Inc., 407 F.2d 4 (5th Cir. 1969), cert. denied, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969). Nor does the interstate movement of mere ingredients suffice. Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir. 1972), cert. denied, 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972). And though we recognize that the Supreme Court has granted certiorari in a second-line injury case where our Brethren of the Ninth Circuit have dispensed with the requirement of interstate sale on the ground that sales of a commodity to be used in constructing an instrumentality of interstate commerce were involved,[11] and that thus a new deliverance in this area may soon come, we are not disposed to depart from our recent decision, supported by well-nigh universal precedent, that interstate sales must be involved for jurisdiction to attach under these acts. Littlejohn v. Shell Oil Co., 483 F.2d 1140 (5th Cir. 1973); Cf. Mayer Paving & Asphalt Co. v. General Dynamics Corp., 486 F.2d 763 (7th Cir.

8. Littlejohn v. Shell Oil Co., 483 F.2d 1140, 1145 (5th Cir. 1973), cert. denied, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973).

9. Cf. Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203 (5th Cir. 1969) (dismissed on pleadings).

10. Indeed, any conceivable sale of *ready-mix* by plaintiffs *or* their competitors would have been such; both proposed to manufacture in Mississippi and deliver to Litton there.

11. In re Western Liquid Asphalt Cases, 487 F.2d 202 (9th Cir. 1973), cert. granted 415 U.S. 988, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974). That Court distinguishes our *Littlejohn* opinion, infra, on the ground that we were not there required to consider such a nexus.

1973), cert. denied, 414 U.S. 1146, 94 S. Ct. 899, 39 L.Ed.2d 102 (1974). We therefore pretermit further discussion of the Clayton, Robinson-Patman Act claims.

### The Sherman Act Claims

■ We have searched the record in vain for evidence supporting plaintiffs' allegations of a combination or conspiracy against them between Litton and anyone in the area of plaintiffs' claims. Proof of this is, of course, essential to plaintiffs' case under § 1 of the Sherman Act and to its conspiracy claims under § 2. First Nat'l Bank v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); Crummer Co. v. Du Pont, 223 F.2d 238 (5th Cir. 1955), cert. denied, 350 U.S. 848, 76 S.Ct. 85, 100 L.Ed. 755 (1955). Facing defendants' sworn challenge to the existence of such a conspiracy, it was up to plaintiffs to produce significant probative evidence —by affidavit or deposition—demonstrating that a genuine issue of fact existed as to this element of the complaint, if summary judgment was to be avoided. First Nat'l Bank v. Cities Service Co., 391 U.S. 253, 289–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The evidence indicates conduct by Litton, albeit pursued in a roughshod way, consistent with its own business purposes,[12] not in concert with but rather at the expense of plaintiffs' competitor and at cross purposes with United.

■ Taking up in order the four Litton actions of which plaintiffs primarily complain,[13] the repeated rebidding and terminal negotiations required by Litton were entirely consistent with a legitimate purpose to obtain the best price and were not improper under Mississippi law.[14] At all times, Litton and Parsons specifically reserved the right to reject any and all bids. Plaintiffs' assertion that its initial and subsequent low bids gave it some right of which it was illegally deprived, and that Litton's actions in requiring rebids and in dickering with the bidders were conspiracy, are therefore ill-founded.

■ As for the designation of United as "sole source" of cement, and its quotation of a lower price to plaintiffs' competitor than to plaintiffs, these do not evidence a conspiracy against plaintiffs, whatever else they may indicate. United did not originate the price differential, it took it as it found it. So far from conspiring with Litton to maintain it, the record indicates strenuous efforts by Litton to persuade United's Reese to quote the same price to both ready-mix bidders and his refusal to do so on advice of his counsel that such an action would interfere with the competitive situation and lay United open to some such suit as this. There is no evidence here of a combination to price-disadvantage plaintiffs, rather the contrary. Nor do plaintiffs allege or offer proof that United's advent as "sole supplier" froze the cement quotation to plaintiffs. For all that appears in the record, United would have been pleased to meet any lower price which plaintiffs could have confronted it with—down, at least, to that which it had quoted the competitor. No bias against plaintiffs appears here; indeed, as Reese averred, United would have preferred plaintiffs get the contract so as to sell the same amount of cement at a larger profit. Thus, however unsavory the "sole supplier" posture which United assumed may be thought, it was not plaintiffs against

12. See Panotex Pipe Line Co. v. Phillips Petroleum Co., 457 F.2d 1279, 1287 (5th Cir. 1972), cert. denied, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86 (1972).

13. Set out at the end of our factual statement above.

14. Section 8968–11, Mississippi Code, upon which plaintiffs rely, appears to be limited to prime contractors' bids to state agencies, as the court below held, and does not prohibit Litton's reservations of rights on bids submitted to it by subcontractors.

whom it militated but plaintiffs' cement supplier, not a party here.

Finally, the "divulging" to plaintiffs' competitor by Litton of the spurious bid of $11.62 was plainly unilateral action by Litton, however questionable, and we seek in vain for the presence or action of any coconspirator in such conduct. The record is clear that United did not even know of it, nor was it conduct which could conceivably have advanced the scheme to put United forward as sole source or supplier. And were we disposed to see the gulled competitor as a conspirator—the beneficiary, though overreached, of some understanding with Litton to shut plaintiffs out—there are no allegations to this effect.

In short, the evidence reveals nothing which by any method short of Procrustes' can be made to demonstrate *a conspiracy* to injure plaintiffs. The Sherman Act is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else. Parmelee Transportation Co. v. Keeshin, 186 F.Supp. 533 (N.D. Ill.1960), aff'd, 292 F.2d 794 (7th Cir. 1961), cert. denied, 368 U.S. 944, 82 S. Ct. 376, 7 L.Ed.2d 340 (1961).

Insofar as plaintiffs' complaints assert an attempted monopolizing of the ready-mix market by means of the various maneuvers noted above in the course of a one-time sale for use to Litton, proofs are entirely lacking of the relevant market, its condition, or of a monopoly or dangerous probability of one. See, *e. g.*, Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203 (5th Cir. 1969). And having correctly disposed of the federal claims, the court below properly dismissed plaintiffs' pendant state antitrust and common-law claims without prejudice, for adjudication by an appropriate state tribunal. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Affirmed.