**HORACE SLAY AUTO SALES, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**Civ. A. No. J79–0300(N).**

United States District Court, S. D. Mississippi, Jackson Division.

March 28, 1980.

---

Ronald C. Smith, Jackson, Miss., for plaintiff.

Henderson S. Hall, Jr., Atty., Wise, Carter, Child & Caraway, Jackson, Miss., for defendant.

## OPINION

WALTER L. NIXON, Jr., District Judge.

### THIS CASE

On June 20, 1979, Horace Slay Auto Sales ("HSAS"), a Jackson, Mississippi used car dealer, filed this lawsuit alleging that General Motors Corporation ("GM"), acting through Otis H. DeRussy, Jr. ("DeRussy"), its Chevrolet Motor Division Zone Manager for the New Orleans Zone,[1] had conspired with franchised Chevrolet dealers to boycott or refuse to deal with HSAS and to fix prices in the sale of new Chevrolet Corvette automobiles, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. A summary of the allegations made by HSAS against GM and DeRussy are as follows:

a. That GM, through its New Orleans Zone Manager, DeRussy, conspired with franchised Chevrolet dealers to refuse to sell new Corvette automobiles to used car dealers and particularly HSAS, thereby monopolizing the sale of new Corvettes.

b. That GM, through DeRussy, conspired with franchised Chevrolet dealers to fix the prices of new Corvettes.

---

1. The New Orleans Zone consist of all of Louisiana and the South half of Mississippi. This suit involves only the sale of new Corvettes, which are marketed exclusively by Chevrolet Motor Division of GM.

c. That the alleged conspiracy obstructed interstate commerce.

d. That HSAS began getting refusals from franchise dealers to sell new Corvettes to it in the latter part of 1975 and that it was refused 235 times in 1977 and 100 times in 1978. That HSAS was only able to procure 15 new Corvettes in 1977; 10 in 1978 and 4 from January to June of 1979. That the reason for these refusals was the alleged conspiracy between GM and its dealers.

e. HSAS alleges damages based upon the allegation that during the last four years it received "approximately" 160 offers to purchase new Corvettes which it could not fill because of the alleged conspiracy, resulting in a loss of an average of $1,000 profit per car. HSAS claims this damage of $160,000, trebled to $480,000 pursuant to the antitrust laws, plus $80,000 in attorneys fees.

GM and DeRussy, the only defendants in this suit, filed a joint motion for summary judgment. After the motion was filed DeRussy was voluntarily dismissed by HSAS.

The Court has considered all the evidence in this case [2] and is of the opinion that there are no genuine issues as to any material fact and GM is entitled to a summary judgment.

**2.** The following affidavits were filed in support of the summary judgment motion:

DeRussy, Zone Manager Chevrolet New Orleans; Tom Kelley Chevrolet, Inc., Brandon, Miss.; Herreld Chevrolet Company, Canton, Miss.; Buddy Lee Chevrolet–Oldsmobile, Inc., Forest, Miss.; Jay Jay Chevrolet–Buick Company, Inc., Gulfport, Miss.; Blackwell Chevrolet Co., Jackson, Miss.; Herrin–Gear Chevrolet Co., Inc., Jackson, Miss.; Nelson Hall Chevrolet, Inc., Meridian, Miss.; Morton Motor Company, Inc., Morton, Miss.; Hubbard Chevrolet Company, Utica, Miss.; Atwood Chevrolet–Olds, Inc., Vicksburg, Miss.; Blount Nored Chevrolet Co., Inc., Yazoo City, Miss.; Rene Olivier, New Car Sales Manager Nelson Hall Chevrolet, Inc.; Pat Purvis, owner Pat Purvis Chevrolet Oldsmobile, Buick, Inc., Crystal Springs, Miss.; John M. Brent, Jr., co–owner Capital Motor Company, Crystal Springs, Miss.; and Elizabeth Raulston–legal assistant, Wise Carter Child & Caraway, counsel for GM.

In response to the summary judgment motion, HSAS filed or referred to the following:

## UNCONTRADICTED FACTS

After evaluation all of the evidence submitted in this case, the Court finds that the following facts are uncontradicted:

a. GM has no policy which prohibits the sale of new Corvette automobiles to used car dealers and that the dealers are free to sell to any customer. DeRussy affidavit at p. 5. All dealer affidavits. All depositions.[3]

b. GM has no policy which requires any dealer to sell a new Corvette automobile at any particular price. DeRussy affidavit at p. 5. All dealer affidavits. All depositions.

c. Neither DeRussy, nor anybody from Chevrolet Motor Division or GM, has told any dealership not to sell new Corvettes to used car dealers or HSAS in particular. DeRussy affidavit at p. 5. All dealer affidavits. All depositions.

d. No dealers were aware of any policy of GM that prohibited the sale of new Corvettes to used car dealers. All dealer affidavits. All depositions.

e. No dealer was aware of any policy of GM dictating the price at which a dealer must sell a new Corvette automobile and that all dealers consider themselves free to sell any new Corvette automobile to any

Affidavit of Scottie Slay, general manager and son of the owner of HSAS; Affidavit of Marilyn Slay, wife of Scottie Slay; Affidavit of Phillip Simon, part owner of a Jackson, Miss. liquor store; Deposition of Albert W. Metcalfe, president of Jordon Auto Company, Natchez, Miss.; Deposition of Bob Belcher, sales manager of Jordon Auto; Deposition of Willie Minor, salesman of Jordon Auto; Deposition of Shelby McKay, sales manager of Hubbard Chevrolet Company, Utica, Miss.; Certified trial transcript of Pat Purvis, owner of Pat Purvis Chevrolet from a Mississippi Copiah County Chancery Court suit styled *Harold Hood v. Pat Purvis Chevrolet Oldsmobile, Buick, Inc.*, No. 20,-075; and Certified trial transcript of Johnny Brent, previous salesman at Pat Purvis' Chevrolet from the same Mississippi Copiah County Chancery Court suit.

**3.** In addition to the depositions relied on by HSAS to oppose the motion, HSAS also took the deposition of Jack Carter, used car sales manager, Atwood Chevrolet–Olds, Inc., Vicksburg, Miss.

customer at any price negotiated between the dealership and its customer. All dealer affidavits. All depositions.

f. A number of dealerships have actually sold new Corvette automobiles to HSAS. Blackwell Chevrolet affidavit at p. 2. Herrin–Gear Chevrolet affidavit at p. 2.

g. In the past four or five years a number of the dealerships have sold new Corvette automobiles to other used car dealers. Harreld Chevrolet affidavit at p. 2. Buddy Lee Chevrolet–Oldsmobile affidavit at p. 2. Herrin–Gear Chevrolet affidavit at p. 2. Nelson Hall Chevrolet affidavit at p. 2. Blount Nored Chevrolet affidavit at p. 2.

h. In the past two years Herrin–Gear Chevrolet, Jackson, Mississippi, one of the largest dealers in the New Orleans Zone, has offered to sell HSAS approximately 10 new Corvette automobiles, but HSAS and Herrin–Gear Chevrolet were unable to agree on the purchase price. In addition, Hubbard Chevrolet, Utica, Mississippi, one of the smallest dealers in the New Orleans Zone, has offered to sell the plaintiff a new Corvette. Herrin–Gear Chevrolet affidavit at pp. 2 and 3. Shelby McKay deposition at p. 8.

i. Several dealerships have not been contacted by HSAS in the past year with respect to purchasing a new Corvette. Buddy Lee Chevrolet affidavit at p. 2. Blackwell Chevrolet affidavit at p. 3. Nelson Hall Chevrolet affidavit at p. 2.

j. One dealer giving an affidavit has a unilateral sales policy that it does not sell new Corvettes to used car dealers. Tom Kelley Chevrolet affidavit at p. 1.

k. Other dealers have no policy which would prohibit a sale to used car dealers, but prefer to sell new Corvette automobiles to retail customers in their own communities. Harreld Chevrolet affidavit at p. 2. Morton Motor Company affidavit at p. 2. Hubbard Chevrolet Company affidavit at p. 2.

l. HSAS has advertised new Corvettes for sale in the *Clarion Ledger* newspaper in Jackson at various times from 1976 through 1979. Elizabeth Raulston affidavit and all exhibits thereto.

m. The supply of new Corvettes over the past five years has remained relatively constant due to the fact that the only GM plant producing Corvettes is and has been operating at or near capacity. DeRussy affidavit at pp. 2 and 3.

n. Customer demand for new Corvette automobiles has increased since approximately 1976. DeRussy affidavit pp. 3 and 4. Tom Kelley Chevrolet affidavit at p. 2. Jay Jay Chevrolet affidavit at p. 2. Blackwell Chevrolet affidavit at p. 2. Morton Motor Company affidavit at p. 2.

o. Since approximately 1976 an increasing number of the new Corvette automobiles shipped to dealerships in the New Orleans Zone have been ordered for particular customers and are referred to as "sold orders." DeRussy affidavit at pp. 4 and 5. Tom Kelley Chevrolet affidavit at p. 2. Herreld Chevrolet Company affidavit at p. 2. Jay Jay Chevrolet affidavit at p. 2. Blackwell Chevrolet affidavit at p. 2. Morton Motor Company affidavit at p. 2.

## STANDARD FOR SUMMARY JUDGMENT

■ Although usually complex, an antitrust suit is not immune from summary judgment. In order to prevail on its motion, GM must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once this requirement has been satisfied, then the burden shifts to HSAS to come forward with substantial probative evidence tending to show the existence of the alleged conspiracy. The Supreme Court in *First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) said:

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an anti–trust complaint setting forth a valid cause of action be entitled to a full–dress trial notwithstanding the absence of any signifi-

cant probative evidence tending to support the complaint. 391 U.S. at 291, 88 S.Ct. at 1593.

Summary judgment in antitrust cases similar to this case is not unusual. The Fifth Circuit and the Southern District of Mississippi have had several recent opportunities to consider motions for summary judgment in antitrust cases. A leading case from the Southern District of Mississippi is *AT&T v. Delta Communications Corp.*, 408 F.Supp. 1075 (S.D.Miss.1976), *aff'd*, 579 F.2d 972 (5th Cir. 1978), *aff'd on rehearing*, 590 F.2d 100 (5th Cir. 1979), *cert. denied* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1980). In *AT&T* the Court considered an antitrust claim that AT&T, CBS, ABC, NBC and others had conspired to put Delta and other ultrahigh frequency TV stations out of business.

In response to the defendants' motions for summary judgment in *AT&T*, Delta relied on *Poller v. Columbia Broadcasting Systems, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), where the Supreme Court cautioned "that summary procedures should be used sparingly in complex antitrust litigation." 368 U.S. at 472, 82 S.Ct. at 491. The Court, in considering *Delta's* reliance on *Poller*, noted that the Supreme Court in a subsequent decision, *First National Bank v. Cities Service Co., supra*, had delineated the standard to be used in determining when summary judgment was appropriate in antitrust cases:

> In that case [*Cities Service*], the plaintiff alleged that Cities Service Company was involved in a conspiracy to boycott the purchase of his oil. The only fact that plaintiff was able to show in support of his allegation was the abrupt decision by Cities Service Company to halt negotiations with him for the purchase of Iranian oil. The court concluded that this one fact, if not met by any contrary evidence, might well be sufficient to require that the case be presented to the jury to determine the motives of Cities Service Company for not dealing with the plaintiff. But most important to today's decision, the court went on to state that the record

in the case before it contained such an overwhelming amount of contrary evidence as to Cities Service Company motives that summary judgment was proper.

> 'Not only is the inference that Cities' failure to deal was the product of factors other than conspiracy at least equal to the inference that it was due to conspiracy, thus negating the probative force of the evidence showing such a failure, but the former inference is more probable.' 408 F.Supp. at 1086, *quoting*, 391 U.S. at 280, 88 S.Ct. at 1588.

Similarly, in *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389 (5th Cir. 1976), the Fifth Circuit affirmed a summary judgment for the defendant in a case involving an alleged refusal to deal, noting as persuasive that the plaintiff never:

> . . . presented any credible evidence, by affidavit, deposition or documentation, other than his own general and conclusory statements, that any monopolistic conspiracy or agreement existed among the alleged wrongdoers. In light of this fatal hiatus, the intent, motive, or state of mind of the defendants are irrelevant. There simply is no Sherman Act violation, no matter how malevolent the competition may be, without a contract, combination, monopoly or conspiracy in restraint of trade. *Id.* at 395.

The Fifth Circuit in *Solomon* also noted that the bare allegations of the plaintiff had been rebutted:

> . . . The mere allegation of the Sherman Act claim requirements of a contract, combination, or conspiracy for the purpose of restraining trade or interstate commerce and resulting damages are not sufficient to withstand a motion for summary judgment once they have been rebutted, *ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52, 54–57 (9th Cir. 1975); see e. g., *Kemp Pontiac–Cadillac, Inc. v. Hartford Automobile Dealers' Ass'n*, 380 F.Supp. 1382, 1389 (D.Conn. 1974) ("glib and conclusory allegations" of conspiracy are insufficient to raise

genuine issues in face of specific denials in sworn depositions and affidavits by defendants); *Searer v. West Michigan Telecasters, Inc.*, 381 F.Supp. 634, 643 (W.D.Mich.1974) (the policy of sparing use of summary procedures in antitrust cases "is no warrant for every plaintiff who can draft an antitrust complaint, no matter how groundless or improbable its allegations, to force his claim to trial despite its deficient factual underpinnings. . . ." *Id.* at 393.

*See also Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186 (5th Cir. 1978); *Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975).

HSAS' reliance on the statement in *Poller v. Columbia Broadcasting Systems, Inc.*, *supra*, that summary judgment "should be used sparingly in complex antitrust litigation" is misplaced. According to the Court in *AT&T*: "[*Poller*] . . . decided no more than that summary judgment is improper where substantial factual evidence tended to show the existence of a conspiracy against an eliminated competitor." 408 F.Supp. at 1086. The Fifth Circuit in *AT&T* recognized that *First National Bank v. Cities Service Co., supra*, only required that a court must indulge in *reasonable* inferences in favor of the party opposing the motion, but if no inference of anticompetitive conduct would be reasonable from the facts summary judgment was appropriate. 590 F.2d at 102.

## NO SUBSTANTIAL FACTUAL EVIDENCE OF A CONSPIRACY

Since GM has come forward with evidence refuting the complaint, the question is whether HSAS has come forward with any substantial factual evidence tending to show the existence of a conspiracy. *Scranton Construction Co., Inc. v. Litton Industries Corp.*, 494 F.2d at 782.

All supporting and opposing evidence must comply with Rule 56(e).[4] The Court has considered, in a light most favorable to HSAS, all the affidavits filed, the state court testimony cited by the HSAS and the depositions referred to by HSAS, and has determined that the affidavits and the state court testimony do not meet the requirements of Rule 56(e) "and present no admissible evidence which would raise any fact issue in this case." *Pan–Islamic Trade Corp. v. Exxon Corp.*, 1978–1 Trade Cas., ¶ 61850 (S.D.Tex.1978) at 73558. The deposition testimony cited by the HSAS all supports GM's motion and, thus, does not raise any material fact issue.

Under 56(e), affiants, deponents and witnesses must be competent to testify and the statements submitted by them must be based on personal knowledge and be admissible as evidence. The affidavits submitted by HSAS are self serving and founded on inadmissable hearsay. It is well established in the Fifth Circuit that assertions based on hearsay do not create genuine issues of material fact which will defeat a motion for summary judgment. *Broadway v. City of Montgomery*, 530 F.2d 657, 661 (5th Cir. 1976); *Pan–Islamic Trade Corp. v. Exxon, supra* at 73,558. *See also Daily Press, Inc. v. United Press International*, 412 F.2d 126, 133 (6th Cir. 1969); *Miles v. Coca–Cola Bottling Co.*, 360 F.Supp. 869, 870–71 (E.D.Wis. 1973). The HSAS' affidavits are based

4. Rule 56(e) provides:

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

solely on what the affiants say some third party said. This type of affidavit was rejected under Rule 56(e) in *Pan–Islamic*: Paragraphs 3, 6, 7, 8, 9 and 10 of Mr. Burns' affidavit consist entirely of statements allegedly made by Joseph Buchanan, the President of Petroco to Mr. Burns, or statements allegedly made by either Mr. Buchanan or representatives of Sonatrack in Mr. Burns' presence. It is well established that Rule 56(e)'s requirement that affidavits submitted in support of or in opposition to a motion for summary judgment be admissible in evidence prohibits the reliance upon hearsay. 6 Moore's Federal Practice ¶ 56.22[1] (2d ed. 1976); *Broadway v. City of Montgomery, Alabama*, 530 F.2d 657 (5th Cir. 1976). Mr. Burns' statements in Paragraphs 3, 6, 7, 8, 9 and 10 constituted hearsay under the application of Federal Rules of Evidence 801–804 and are inadmissible to prove the truth of the matters asserted. Other portions of Burns' affidavit consist of his characterizations of the feelings of third parties. (See ¶ 3 ¶ 6). These statements are either matters of which Burns is legally incompetent to testify (Rule 602) or, if relayed to him and offered to prove the truth of their contents, constitute inadmissible hearsay. 1976 Trade Cas. ¶ 61850 at 73558.

■ Rule 56(e)'s hearsay and incompetency prohibition applies equally to the Mississippi Chancery Court testimony of Pat Purvis and Johnny Brent cited by HSAS. GM has filed affidavits of both Mr. Purvis and Mr. Brent in support of its motion.[5] From Mr. Purvis' affidavit it is clear that, when giving his Chancery Court testimony, he merely assumed that since he did not think that it was a good business practice to sell Corvettes to used car dealers, then GM must be in accord. Mr. Purvis was not competent to testify as to what GM's policies were regarding sales of new Corvettes to used car dealers, and, therefore, his state court testimony is not competent under Fed.R.Civ.P. 56(e). Similarly, Mr. Brent's affidavit shows that the portion of his testimony relied on by plaintiff was incompetent under Rule 56(e), being entirely hearsay.

## INFERENCE OF CONSPIRACY WOULD BE UNREASONABLE

From all the evidence in this case, it would be unreasonable for the Court to draw any inference that any conspiracy exists. With regard to permissible inferences, the Fifth Circuit, sitting *en banc*, said in *AT&T*:

In passing on motion for summary judgment, even where the underlying facts are undisputed, it is Hornbook law that the court must indulge every *reasonable* inference from those facts in favor of the party opposing the motion. Insofar as any weighing of inferences from given facts is permissible, the task of the court is not to weigh these against each other, but rather to cull the universe for possible inferences from the facts established by weighing each against an abstract standard of reasonableness, casting aside those which do not meet it and focusing solely on those which do. If a frog be found in the party punch bowl, the presence of a mischievous guest–but not the occurrence of spontaneous generation–may reasonably be inferred. 590 F.2d at 101–02. (emphasis by the Court).

■ HSAS would have this Court infer the existence of a conspiracy to refuse to sell it new Corvettes. The evidence, however, reveals that many dealerships have not refused to deal with HSAS, or other used car dealers. These dealers have sold

---

5. In his affidavit, Mr. Purvis states that in the Mississippi Chancery Court case GM was not a party; that the issues of the state court suit were different from this suit, involving an alleged breach of contract; and, finally, that at the time his testimony was given he did not know whether GM had any policy regarding sales of new Corvettes to used car dealers. Mr. Purvis further states that he did not consult with GM prior to giving his testimony and no representative of GM testified in that case. He further states that he has never been instructed by any representative of GM not to sell new Corvettes to used car dealers or HSAS in particular.

or offered to sell new Corvettes to HSAS and other used car dealers, including HSAS' direct competitors.[6]

HSAS insists, however, that some dealers have refused to sell it new Corvettes. Absent a conspiracy, dealers are free to unilaterally decide not to do business with HSAS. *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The Second Circuit reviewed the franchised automobile dealer's right to unilaterally refuse to deal with any particular customer in *National Auto Brokers v. General Motors Corp.*, 572 F.2d 953 (2d Cir. 1978), *cert. denied* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979). In *National Auto Brokers* ("NABCOR"), NABCOR claimed that GM, its franchised dealers and others had conspired to refuse to deal with it. The Court found there indeed were a few refusals, but also found that those refusals were unilateral and not the product of any concerted action necessary to the finding of an antitrust conspiracy.

The uncontradicted evidence in this case shows that even if there were some refusals, they were the result of independent business decisions.[7] Franchised Chevrolet dealers are independent businessmen, having varying policies with respect to sales of new automobiles to used car dealers, free from any restrictive policy of GM. The importance of independence of action was emphasized by the Court in *AT&T*:

> Here though, the proof shows without conflict that the separate actions of the networks were not similar, but different. Each of the networks *dealt* with Delta and each dealt with it differently. This lack of sameness prohibits any inference

of concerted action. 408 F.Supp. at 1101 (emphasis by the Court).

Also, the Second Circuit pointed out in *NABCOR* that there are many very good reasons why a franchised dealer might refuse to deal with HSAS or any other used car dealer:

> Indeed, there were several good reasons why each dealer might have independently decided not to do business with Nabcor, as was the dealer's right, *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). In the first place, Nabcor was seeking to purchase cars at such a small markup over the dealer's cost that the dealer might well conclude independently that sales to Nabcor would not be worthwhile from the dealer's own standpoint.
>
> Secondly, the dealer might also independently conclude that since Nabcor's purpose was to undercut the dealer in selling to the public, sales by the dealer to Nabcor would adversely affect the dealer's own more profitable retail sales. There were sufficient grounds for concern over Nabcor's solvency, a reputation, and responsibility. Lastly, a dealer might become apprehensive that the respectability of the market for new GM cars would suffer in the public's eyes as a result of Nabcor's practice of selling GM cars without providing service. . . . *Id.* at 959.

Because of the demonstrated independence of action on the part of franchised Chevrolet dealers, there is simply no basis for finding a conspiracy between Chevrolet dealers and GM.

---

**6.** In fact, the affidavit of Tom Desper, the Vice President and General Manager of Herrin–Gear Chevrolet, Inc., Jackson, Mississippi, states that Herrin–Gear has called HSAS at least ten times in the past two years offering to sell the Plaintiff new Corvettes. However, HSAS and Herrin–Gear were not able to agree on a selling price. Herrin–Gear affidavit at pp. 2 and 3. Perhaps no single fact set out in the affidavits is more damaging to HSAS's allegations as is this. HSAS had the opportunity to purchase new Corvettes from a large volume Chevrolet dealer in its own home town. Moreover, during this same time period Herrin–Gear sold new Corvettes to other used car dealers, as did

other Chevrolet dealers. Herreld Chevrolet affidavit at p. 2. Buddy Lee Chevrolet–Oldsmobile affidavit at p. 2. Herrin–Gear Chevrolet affidavit at p. 2. Nelson Hall Chevrolet affidavit at p. 2. Blount Nored Chevrolet affidavit at p. 2.

**7.** The affidavit of Tom Kelley, the owner of Tom Kelley Chevrolet, reveals that he has a sales policy that prohibits the sale of new Corvette automobiles to used car dealers, because he believes that it is not good business to sell new cars to his competitors. Tom Kelley Chevrolet affidavit at p. 1. See also the Pat Purvis affidavit pp. 3–4.

During the past five years, the Corvette plant in St. Louis has operated at capacity with the supply of new Corvettes being relatively constant. During the same time period, dealers experienced increased demand for Corvettes in their own communities resulting in the sale of new Corvettes at or near Manufacturer's Suggested Retail Price. Given these present conditions of supply and demand, dealers have no financial reason for selling new Corvettes to HSAS at large discounts. To do so would be to give away a potential profit on a new Corvette sale. Herrin–Gear Chevrolet one of the largest dealers in the New Orleans Zone and Hubbard Chevrolet of Utica, Mississippi, one of the smallest dealers in the New Orleans Zone, both offered to sell Corvette automobiles to HSAS. These potential sales were not consummated because HSAS and these dealers were not able to agree on a purchase price. When a franchised dealer offers to sell to HSAS, but HSAS and that dealer cannot agree upon a price, there clearly is no concerted refusal to deal. The court in *NABCOR* characterized such a situation as a "good reason" why a dealer validly might refuse to deal with a broker:

> . . . In the first place, Nabcor was seeking to purchase cars at such a small markup over dealer's cost that the dealer might well conclude independently that sales to Nabcor would not be worthwhile from the dealer's own standpoint. 572 F.2d at 959.

All of the evidence in this case makes it apparent that HSAS' inability to purchase as many new Corvettes as it would like was not due to any conspiracy, but rather to its unwillingness or inability to pay the going price in the marketplace for new Corvettes.

Finally, HSAS admits in its complaint that it purchased ten new Corvettes in 1978 and four new Corvettes in the first six months of 1979.[8] The HSAS' advertisements show that it offered new Corvettes for sale at various times from 1976 to 1980.

8. In comparison, small and medium size Chevrolet dealers typically received 1 to 3 new Corvettes a year due to their limited availability.

Chevrolet dealers have sold new Corvettes to HSAS and continue to be willing to sell new Corvettes to HSAS and its competitors. HSAS' and other used car dealers' ability to purchase new Corvettes negates any inference of conspiracy, as recognized by the Court in *NABCOR*:

> Appellant's [*Nabcor's*] own uncontradicted proof establishes that at all times, despite some refusals, there were many GM dealers willing to deal with Nabcor
>
> .  .  .  .  .
>
> In light of these circumstances, the limited number of refusals by some dealers to fill Nabcor orders are insufficient to permit an inference of concerted action on the part of appellees, the essential predicate of an antitrust conspiracy. 572 F.2d at 959.

### SUMMARY JUDGMENT SHOULD BE GRANTED

All the evidence in this case eliminates any inference of concerted refusal to deal. If HSAS has been unable to purchase as many new Corvettes as it would like, it is due to its unwillingness or inability to pay the market price. The only reasonable inference is that Chevrolet dealers simply are unwilling to enter into unattractive financial arrangements with HSAS. A factual situation similar to this was found by the court in *AT&T* to be an adequate basis upon which to grant summary judgment.

In *Cities Service*, the Court held that even the defendant's failure to conclude the attractive bargain was insufficient, standing alone, to withstand a summary judgment motion. In the instant case the bargain is demonstrably unattractive.

. . . The quoted passed from *Cities Service* clearly indicates that no inference of anticompetitive conspiracy would be reasonable from the facts here which show no more than the failure to conclude an unattractive bargain. 408 F.Supp. at 1085.

(McKey deposition at p. 5); (Metcalfe deposition at p. 10); (Purvis affidavit at p. 8).

In this case, there is no significant probative evidence tending to support HSAS' allegation of conspiracy. HSAS and other used car dealers have been able to acquire new Corvettes from Chevrolet dealers. Moreover, HSAS and its competitors continue to have opportunities to purchase new Corvettes from Chevrolet dealers. There are, therefore, no material facts in dispute and summary judgment will be granted in favor of GM all counts in the complaint. An Order will be entered granting GM's motion for summary judgment.