**OLYMPIA COMPANY, INC., and Olympia Roofing Company, Inc.**

v.

**The CELOTEX CORPORATION, Standard-Taylor Industries, Inc., et al.**

Civ. A. No. 76–373.

United States District Court,
E.D. Louisiana.

Nov. 9, 1984.

Jack N. Price, Austin, Tex., for Olympia Company, Inc. and Olympia Roofing Company, Inc.

Charles Kohlmeyer, Jr., Ernest L. Edwards, George Frazier, New Orleans, La., for The Celotex Corp.

Jack M. Alltmont, New Orleans, La., for Standard-Taylor Industries, Inc. and related entities and persons.

## ORDER AND REASONS

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court on the motion of defendant Celotex Corporation (Celotex) and the motion of defendants, Standard-Taylor Industries, Inc. and related entities and persons (Standard)[1] for summary judgment. Following oral argument, the motions were taken under submission. Having considered the memoranda, the record and the law applicable to this motion, the Court grants the motions of defendants for the following reasons.

### I. *Course of the Litigation*

Plaintiffs, Olympia Company and Olympia Roofing Co., Inc. (hereinafter jointly referred to as Olympia) instituted this litigation in 1976, alleging, inter alia, various violations of the antitrust laws. The subsequent course of this litigation, as is evi-

---

1. In Plaintiffs' Fourth Amended Complaint, (Record (R.) Vol. X, Document (D.) 218), superseding all prior pleadings of plaintiffs, the following defendants were named: (1) The Celotex Corporation, (2) Standard-Taylor Industries, Inc., (3) Standard Roofing Company of New Orleans, Inc., (4) Robbins Taylor, and (5) Pierre F. Carriere. All of the defendants, with the exception of Celotex, are hereinafter sometimes referred to jointly and collectively as "Standard."

denced by the voluminous record, involved extensive discovery, several amendments to plaintiffs' complaint, substitutions of counsel for plaintiffs, and numerous extensions of cut-off dates, continuances and the like, granted at the instance of plaintiffs. In late 1979, defendants Celotex and Standard filed motions for summary judgment, seeking dismissal of the action. However, prior to the hearing on those motions, the Court was apprised of plaintiffs' intention to again substitute counsel. The Court allowed the substitution. In order to afford plaintiffs' latest counsel an opportunity to develop the necessary facts, the Court also ordered that the pending motions for summary judgment be continued indefinitely.[2]

By an Order of the Court, plaintiffs then filed their Fourth Amended Complaint, which superseded all prior pleadings of plaintiffs.[3] As the result of a status conference held on May 14, 1980, the Court entered an Order, setting forth the manner in which this case was to further proceed, and requiring plaintiffs to file a Pretrial Statement which would thoroughly set forth plaintiffs' case and the factual and evidentiary basis for same.[4] Specifically, plaintiffs were directed to articulate their claims, by setting forth "in simple, declarative sentences all material facts relied upon by Plaintiffs in support of their claims for relief ..." The Court directed that the "Pretrial Statements shall serve as each parties' contribution to the Pretrial Order," and specified that "[a]ny factual contention, legal contention, any claim for relief or defense in whole or in part, or affirmative matter not set forth in detail as provided hereinabove shall be deemed abandoned, uncontroverted, or withdrawn, notwithstanding the contentions of any pleadings or other papers previously filed herein. The case shall be tried upon the Pretrial Statements." Finally, the Court provided that "[i]n the event defendants choose to do so, they may admit Plaintiffs' narrative facts relating to a legal contention or contentions for purpose of a Motion for Summary Judgment or Partial Summary Judgment. Any such Motion will be heard in accordance with the Federal Rules of Civil Procedure and the Local Rules of this Court, except that the narrative statements of fact in the parties' Pretrial Statements shall serve as the Statements of Material Facts required by Local Rule 3.9."[5] Furthermore, plaintiffs were allowed to take additional discovery subject only to the restriction that such discovery not be duplicative. Plaintiffs' Pretrial Statement, although it was filed approximately six months after the deadline set by the Court for its filing, was accepted by the Court.[6] Thereafter, the voluntary dismissal of certain of plaintiffs' claims and the motions of defendants to strike necessitated amendments to the plaintiffs' Pretrial Statement.[7] In its final form, Plaintiffs' factual contentions are set forth in their Second Amended Pretrial Statement. In response to the motions of defendants for summary judgment, plaintiffs filed into the record a letter of counsel, stating that "the pretrial statement contains both the facts and law on which Plaintiffs must rely." The motions were fixed for hearing on a date approximately two weeks prior to the pretrial conference and two days prior to the expiration of the discovery deadline set by the Court.

---

**2.** In a Minute Entry of January 4, 1980, the Court noted that it was "of the opinion that [plaintiffs' counsel's] entrance in the case [would] result in a narrowing and clarifying of the issues and [would] in all probability obviate the necessity of hearing all of the contentions set forth in the motions for summary judgment." R. Vol. X, D. 211.

**3.** R. Vol. X, D. 212, 218, 219 and 220.

**4.** R. Vol. X, D. 221.

**5.** R. Vol. X D. 221, Order of May 14, 1980, ¶¶ 25, 26, 37–39.

**6.** Defendants filed motions to dismiss in May of 1982 based upon the failure of plaintiffs to comply with the Court's Order in this regard. On August 10, 1982, one day prior to the scheduled hearing date on those motions, plaintiffs filed the Pretrial Statement.

**7.** R.Vol. XII–XIII, D. 282–298.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Rule 56(c), Fed.Rules Civ. Proc. When a motion for summary judgment is made and supported in the manner provided in Rule 56(e) of the Federal Rules of Civil Procedure, "an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed.Rules Civ.Proc.

■ The Court is not unmindful of the Fifth Circuit's admonition to approach summary judgment with caution, particularly with respect to anti-trust litigation. *Transource International, Inc. v. Trinity Industries, Inc.,* 725 F.2d 274, 279 (5th Cir. 1984). Nonetheless, summary judgment is sometimes appropriate in anti-trust actions. "It is now established that 'simply because a suit is brought under the antitrust laws does not foreclose a summary judgment.'" *Transource International, Inc. v. Trinity Industries, Inc.,* 725 F.2d 275, 279, quoting *In re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d 436, 440 (5th Cir.1982), citing, *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1112 (5th Cir.1979).

Despite the long and arduous course of this litigation, despite every reasonable opportunity afforded the plaintiffs to discover triable issues of fact, and despite the Court's many efforts to ensure that plaintiffs' alleged grievances, if proved, would be redressed, the Court finds that defendants are entitled to summary judgment, based upon the uncontroverted evidence and the law applicable to this case.

II. *Motion of Celotex for Summary Judgment*

A. *The Facts*

For the purpose of this motion, Celotex has admitted all of the narrative statements of fact in plaintiffs' Second Amended Pretrial Statement, except for those which Olympia admits have no factual basis or support and which have been conclusively refuted with sworn testimony based upon personal knowledge. The narrative statements of fact are incorporated herein by reference and are attached hereto as Appendix I. Additionally, Celotex has submitted other facts which are uncontested and which may be material. These are contained in Celotex's Rule 3.9 Statement of Material Facts, incorporated herein by reference and attached hereto as Appendix II. The facts contained in Celotex's 3.9 Statement are supported by the evidence and have not been rebutted or controverted by plaintiffs in the manner provided under Rule 56(e). Thus, the Court accepts these facts as undisputed.

Based upon plaintiffs' narrative statement of facts and the record herein, Olympia's contentions may be summarized as follows. Olympia competed with Standard and other similar companies in securing roofing jobs and furnishing roofing services within the New Orleans area. In doing so, Olympia purchased roofing materials from Celotex or its business predecessors. For several years, Olympia was on Celotex's Approved Roofers list. This, based upon the uncontroverted evidence, enabled Olympia to secure a Celotex roofing bond covering any roof that (1) was installed and repaired by an approved roofer (2) using Celotex materials (3) in accordance with Celotex's published specifications. Roofing bonds are significant in the context of this case for two reasons. First, Olympia was a union roofing contractor.[8] Architectural specifications control whether a roofing job must be performed with union labor and whether a roofing bond will be required. According to Olympia, these specifications provide that virtually all large commercial roofing jobs ($250,000 and over) must be bonded and applied by union roofers. Accordingly, Olympia contends that the abili-

---

**8.** Although this is not specified, it is implicit in plaintiffs' contentions.

ty to secure a bond was indispensible to a union roofing contractor in securing such jobs. Second, when Celotex's competitors reduced their bond coverage for unspecified reasons, Celotex "became possessed of a unique bond program," and was, thus, able to achieve a significant share of the market for "sale of roofing materials to bonded union roofing contractors" in the Greater New Orleans Area "because of its unique bonding program."[9] According to Olympia, Celotex thereby obtained a "dominant and monopolistic position" in the relevant market, and enjoys a market share in excess of 60%.[10] Plaintiffs also assert that in several instances, Standard was granted lower prices on certain materials by Celotex than those granted to Olympia. The factual allegations are the basis for the alleged violations specified by plaintiffs in the Pretrial Statement, as follows: (1) monopolization and attempted monopolization of the relevant markets, (2) unreasonable restraint of trade within the relevant markets in violation of Section 1 of the Sherman Act, (3) price discrimination in violation of Section 2(a) and (f) of the Robinson-Patman Act, and (4) tying in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act.[11] (On the latter allegation, Olympia contends that Celotex tied the furnishing of roofing bonds to the sale of materials.) The allegations of plaintiffs' Pretrial Statement contain the implication that Celotex and Standard conspired, but there is no specific allegation to that effect. A strict application of the Court's order relative to the Pretrial Statement would require that this legal contention be deemed abandoned or withdrawn. Nonetheless, the Court has addressed the issue of conspiracy herein.

Celotex contends that all of Olympia's allegations are either irrelevant, insufficient, unsupported, or contradicted by unrefuted evidence. Celotex further contends that certain of Olympia's claims are time-barred.

### B. Fact of Damage and Amount of Injury

■ Plaintiffs seek treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, based upon alleged antitrust violations under several theories. In order to recover such damages, a plaintiff must prove (1) a violation of the antitrust laws, (2) cognizable injury attributable to that violation, and (3) at least the approximate amount of damage. *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.,* 670 F.2d 575, 579 (5th Cir.), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). Mere proof of an antitrust violation, in and of itself, is not sufficient to support an award for damages; rather, a plaintiff must prove, as a matter of fact and with a fair degree of certainty, injury attributable to something the antitrust laws were designed to prevent. *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562–563, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981). "It is imperative that the fact of the damage causing injury be established." *In Re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d 436, 443 (5th Cir.1982).

■ Olympia's conclusory allegations do not demonstrate that it has suffered actual injury. The only element of damage that Olympia has attempted to identify and quantify is that allegedly attributable to price discrimination.[12] However, that calculation merely presumes damages from the differential between prices extended to Olympia and Standard. As is developed further in our discussion of plaintiff's price discrimination claims, it does not purport to show actual injury by demonstrating the likelihood that Olympia lost sales or profits because Celotex extended discriminatory prices to Standard, as required by law for

---

**9.** Olympia's Second Amended Pretrial Statement, ¶¶ 18–26, 36.

**10.** *Id.*

**11.** Olympia's Second Amended Pretrial Statement, Legal Contentions, p. 32.

**12.** Olympia's Second Amended Pretrial Statement, ¶ 55.

Olympia to prevail on its claims.[13] Summarily, none of Olympia's allegations support the conclusion, or even attempt to demonstrate, that it suffered actual injury. The Court's review of the entire record in this matter leads to the inevitable conclusion that plaintiffs' claim of injury and for damages resulting therefrom amounts to nothing more than unsupported assumptions, conclusory allegations, and undocumented hypotheses, which are insufficient to withstand a summary judgment motion. In this case, as in the case of *In Re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 443 (5th Cir.1982), plaintiffs have not established a triable issue of *fact* of injury, or of its cause, much less the amount of damage. There is a dearth of evidence which would establish this fact. Yet, at the trial of this matter, the plaintiffs would have been required to put forth substantial evidence on this issue. *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575, 582 (5th Cir.1982), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). Olympia relies on the statement that it "propose[s] to offer proof of damages ... employing a ten year straightline projection of sales and loss net profits for a 'future' period of ten years from and after 1976." [14] However, this proposed methodology is of no moment, absent sufficient allegations of, and evidence to support, the fact of injury, which are nowhere to be found in the record of this case. Since Olympia has apparently chosen to rest upon its pleadings rather than substantiating its claims with evidence, summary judgment is appropriate. Rule 56(e) Fed.Rules Civ.Proc.; *see*, e.g., *In Re Municipal Bond Reporting Antitrust Litigation, supra; Jones v. Borden Co.*, 430 F.2d 568, 574 (5th Cir.1970).

Having found that plaintiffs' claim for damages is fatally deficient in that plaintiffs have failed to produce evidence of injury and the amount of damages, the Court has in effect found that summary judgment on Olympia's claims is warranted herein. Nonetheless, for the sake of completeness, the Court further finds that summary judgment is warranted as to each of Olympia's allegations of violations of the antitrust laws, as set forth herein.

### C. Monopolization

■ Olympia has failed to adduce evidence upon which a trier of fact could conclude that a *prima facie* case of monopolization has been established. The gravamen of Olympia's claim is its contention that from and after the year 1974, Celotex's unique bonding program eventually allowed it to achieve a market share in excess of 60%.[15] Olympia's allegations in connection with this claim are either unsupported by the facts or directly contradicted by the evidence, thus, requiring that summary judgment be granted.

Olympia alleges that the relevant product market consists primarily of union bonded commercial roofing jobs over $250,000.00 in value.[16] Yet, it is uncontested that the largest job Olympia performed during the period from 1972 to date was in the range of $60,000.00 to $100,000.00. Olympia's president testified to this fact.[17] Thus, Olympia has defined the relevant product market, for purposes of this litigation, as one in which it was not even a participant for two years prior to and during the period of time when Celotex allegedly began to acquire monopoly power. Moreover, Olympia's definition of this market reflects an effect on a specific competitor, rather than the realities of competition, ignoring a major premise of antitrust litiga-

---

**13.** *See*, e.g., *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562–563, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981); *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 580 (5th Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982).

**14.** Olympia's Second Amended Pretrial Statement, ¶ 55.

**15.** Olympia's Second Amended Pretrial Statement, ¶ 36.

**16.** Olympia's Second Amended Pretrial Statement, ¶¶ 56(g), 58(d).

**17.** Deposition of William J. Manion, taken on May 31 and June 2, 1977, Vol. III, Tr. 114–115.

tion, that is, that the antitrust laws are concerned with "the protection of competition, not competitors." *See, Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).[18] Olympia's allegations of monopolization, in conformance with the evidence, cannot proceed past the threshold determination of the product market allegedly monopolized. As such, its contentions can only be construed as going to an effect on a competitor,[19] rather than to competition in a defined product market.

Furthermore, the relevant geographic market alleged by Olympia has been artificially delineated without a full consideration of the facts and evidence. Olympia's own experts conceded that the existing information did not indicate whether the market chosen took into account either the areas in which Olympia actually competed [20] or the areas in which Olympia's actual competitors competed.[21] This reinforces the conclusion that the nature of the alleged wrong to Olympia must be couched in terms of an effect on a specific competitor, rather than on competition. And, as previously stated, it is the latter of these which the antitrust laws seek to protect.

Moreover, Olympia's allegation that Celotex acquired a market share in excess of 60% can only be termed sheer speculation, unsupported by any evidence which could possibly create a triable issue of fact in this regard. The lack of any evidence which would allow a trier of fact to determine

Celotex's market share is predicated primarily upon the failure of Olympia to define the relevant product and geographic markets on the basis of any evidence of record. There is simply no data of record from which even a rough approximation of market shares could be derived, and the Court is left with no evidence of the origin or accuracy of this figure. Olympia's experts admitted that the data accompanying its Second Amended Pretrial Statement showed only the percentage of Celotex sales that went to certain selected roofers in the New Orleans area, and agreed that this information had little (if any) meaning, in the context of this case, absent comparable figures for Celotex competitors. These same experts testified that the information was incomplete even as to Celotex sales and conceded that even complete information as to such sales would not enable them to adequately define Celotex's share of the relevant market.[22]

■ It is well-settled that the relevant product and geographic markets must be defined with some degree of precision to enable the trier of fact to determine the existence of monopoly power. *Dimmit Agri Industries, Inc. v. CPC International Inc.,* 679 F.2d 516 (5th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983). "[A] section 2 plaintiff attempting to prove either completed monopolization or attempt must provide the jury with sufficient evidence to permit it to

18. The fallacy of plaintiff's reasoning is shown by Justice Stevens' comments in *Mullis v. ARCO Petroleum Corp.,* 502 F.2d 290, 298–299, (7th Cir.1974):

"The fact that an injury to a particular competitor may be unusually severe is not a justification for adopting a market definition which only considers the particular product line which he has previously sold or purchased ... And whether the competition is more intense on the seller's or the buyer's side of the market, we may not arbitrarily segregate one brand from equally acceptable substitutes in order to protect a particular competitor from injury."

19. From the standpoint of adverse effects, the competitor in question is Olympia; from the standpoint of desirable effects, the competitor

in question is Standard, based upon plaintiffs' allegations.

20. Deposition of Dr. Jane S. Cromartie, taken on January 5, 1984, Tr. 140–148; Deposition of Phillip W. Jeffress, taken on January 4, 1984, Tr. 79–93, 140–141 & Exhibits 3, 4.

21. Indeed, the geographic market utilized by plaintiffs' experts did not include Baton Rouge, Louisiana, although it was a controversy surrounding a Baton Rouge project which precipitated this litigation. See, Jeffress deposition, Tr. 54–63; Complaint (R.Vol. I, D. 1).

22. Cromartie Deposition, Tr. 33–35, 62–69, 77–80, 148–149, 207, 266–272, Exhibits 5 & 6; Jeffress Deposition, Tr. 79–83, 140–141, Exhibits 3 & 4.

define the relevant geographic and product market." *Id.* at 525. *See also, Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Municipal Bond Reporting Antitrust Litigation,* 672 F.2d 436, 441 (5th Cir.1982); *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 276, 284–286 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). Absent evidence to create a triable issue of fact in this regard, summary judgment is appropriate. *Scranton Construction Co. v. Litton Industries Leasing Corp.,* 494 F.2d 778, 783 (5th Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975).

█ Furthermore, in this Circuit, "[i]t appears that something more than 50% of the market is a prerequisite to a finding of monopoly." *Cliff Food Stores, Inc. v. Kroger Co.,* 417 F.2d 203, 207 n. 2 (5th Cir. 1969). *See also, Dimmitt Agri Industries, Inc. v. CPC International, Inc.,* 679 F.2d 516, 528–531, nn. 11–13 (5th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983). The Fifth Circuit subscribes to the view that evidence of defendant's conduct in the market is inadequate to sustain a finding of monopoly, absent accurate information demonstrating a requisite market share. *Dimmitt Agri Industries, Inc. v. CPC International, Inc.,* 679 F.2d 516, 528–531 and nn. 11–14 (5th Cir. 1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983); *see also, P. Areeda & D. Turner, II Antitrust Law* ¶ 515 (1978).

In the instant case, the record discloses little more than unsupported and conclusory allegations of Celotex's conduct. And, viewing all inferences from the evidence of record in favor of the non-moving party, there is no evidence from which a trier of

fact could conclude that Celotex enjoyed the requisite market share. Olympia argues that "industry observers" have concluded that Celotex acquired such a market share. Again, this is a conclusory allegation which is not borne out by the facts of this case, as shown by the record. Olympia's experts concede that there is insufficient data to come to a conclusion, with any degree of precision or accuracy, as to Celotex's share of the market.[23] Nor has Olympia demonstrated for purposes of defeating summary judgment, anywhere of record, including in its Pretrial Statement, that there is evidence to support a finding, based on other than speculation, relative to Celotex's market share. Although in certain instances, an examination of the evidence on the issue of market share would reveal deficiencies which go to the weight and sufficiency of the evidence, in the instant case, there is simply no basis for a trier of fact to determine what is the relevant product and geographic markets and what is the defendant's market share. Under these circumstances, it would be futile for plaintiffs to proceed to trial on these claims.

█ Moreover, Olympia's allegation of the manner in which Celotex acquired monopoly power warrants the conclusion that defendants are entitled to judgment in their favor as a matter of law. Olympia alleges that Celotex "became possessed of a unique bond program", which allowed it to achieve a share of the market for sale of roofing materials to bonded union roofing contractors in excess of 60%.[24] Olympia asserts that this achievement resulted from changes in the bond programs of Celotex's competitors, and the circumstances attendant therein.[25] Thus, based solely upon Olympia's allegations in this regard, it is clear that if, in fact, Celotex achieved a

---

23. Jeffress deposition, Tr. 63–75; Cromartie deposition, Tr. 207. We note that one of these experts testified that he reached a conclusion of market power, based upon Celotex's bonding program which set it apart from other competitors. Jeffress deposition, Tr. 74–75. However, as is discussed, infra, Celotex's the bonding program does not constitute a willful acquisition of

monopoly power, as required for a finding of monopolization.

24. Olympia's Second Amended Pretrial Statement, ¶ 36.

25. *Id.*

market share of greater than 60% by reason of the bond program, then that achievement was the result of the unilateral actions of its competitors. Indeed, Olympia's experts stated unequivocally that Celotex's monopoly power, if any, was attributable to its bond becoming unique through the actions of its competitors with regard to their respective bond programs, as opposed to a willful acquisition of monopoly power by Celotex.[26] The United States Supreme Court has made it clear that a claim of monopoly will not lie absent willful acquisition of power:

> "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

*United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Olympia's allegations, insofar as they might be construed to assert the acquisition of monopoly power through other means are addressed in the discussion below of the remaining claims.

### D. Attempted Monopolization

■ In order to prove attempted monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2, Olympia must demonstrate that (1) Celotex had the specific intent to accomplish the illegal result, and (2) there was a "dangerous probability" that the attempt would be successful. *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

■ Celotex argues that summary judgment should be granted on this claim based upon Olympia's failure to produce any evidence of specific intent. Following our review of all of the evidence of record, taking the factual allegations of Olympia's Pretrial Statement as true, and viewing all inferences from the evidence in favor of the non-moving party, we are inclined to agree. Olympia's claim of attempted monopolization, again, rests primarily on Celotex's acquisition of a unique bond program, which arose solely from the unilateral actions of Celotex's competitors. Based upon the facts, there is a dearth of evidence from which a trier of fact could conclude that Celotex had specific intent to acquire a monopoly. We are not unmindful that summary judgment is rarely appropriate on the issue of a party's intent. However, in the instant case, there is a more compelling basis upon which summary judgment must be granted as to this claim. The Fifth Circuit has held that proof of the relevant market in attempt cases is required in connection with the dangerous probability of success element of the attempt offense. *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 286 (5th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). Specifically, it is necessary for the plaintiff to establish a dangerous probability of monopolization *in the relevant markets. Id.* Thus, Olympia cannot prevail on this claim, based upon its failure to sufficiently define and establish the relevant markets, as discussed in subpart C, above. In this case, evidence is "entirely lacking of the relevant market, its conditions, or of a monopoly or a dangerous probability of one"; thus, summary judgment is appropriate. *Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778, 783 (5th Cir.1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975).

### E. Price Discrimination

■ Celotex contends that Olympia's claims of price discrimination are time-barred. A four-year statute of limitations is provided in § 4B of the Clayton Act, 15 U.S.C. § 15b. It is uncontested that Olympia chose to discontinue dealing with Celo-

---

26. Cromartie deposition, Tr. 38–39, 51–55, 174–178; Jeffress deposition, Tr. 74–75, 94, 113–117, 125–126, 132–134, 189–190.

tex in October of 1973.[27] The original complaint in this matter was filed on February 5, 1976.[28] Price discrimination was not specifically alleged by plaintiffs until the filing of an amended complaint on August 31, 1977.[29] Rule 15(c) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

Pleadings must be construed "as to do substantial justice." Rule 8(f) Fed.Rules Civ.Proc. In an antitrust action, pleadings must be given a liberal reading. *Exhibitors Poster Exchange, Inc. v. National Screen Service Corp.*, 421 F.2d 1313 (5th Cir.1970), *cert. denied*, 400 U.S. 991, 91 S.Ct. 454, 27 L.Ed.2d 439 (1971). Although Olympia's original complaint did not specifically set forth an allegation of price discrimination, it is clear that this claim arose out of the same general type of conduct as that alleged in the original complaint. Thus, the claim is not time-barred.

Nonetheless, Olympia's claim of price discrimination cannot withstand summary judgment for several reasons. Olympia seeks damages for price discrimination allegedly (1) in violation of § 2 of the Robinson-Patman Act and (2) as part of a conspiracy in violation of § 1 of the Sherman Act. Even assuming that the underlying factual contentions upon which Olympia bases this claim are true, the claim is untenable.

*(1) Robinson-Patman Act*

 Under § 2 of the Robinson-Patman Act, 15 U.S.C. § 13, Olympia, in order to prevail, would be required to prove that Celotex discriminated in price (1) between different purchasers (2) of commodities of like grade and quality (3) where the effect of such discrimination is to substantially lessen competition or tend to create a monopoly, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, and (4) where such differential is not in response to changing market conditions. *M.C. Manufacturing Co., Inc. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1065 (5th Cir.1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976). Thus, a finding that the Act has been violated requires a showing that purchasers are in competition with one another at the time of the purchases, and that there was a sale of like goods to at least two different purchasers at different prices with an adverse effect upon competition. *Id.*

 The uncontested evidence indicates that Olympia neither purchased materials from, nor placed orders with, Celotex after October of 1973.[30] Yet, Olympia claims damages for price discrimination from 1972 to 1976.[31] It is abundantly clear that Olympia cannot recover on any claim for damages allegedly resulting from price discrimination occurring after October of 1973, based upon the specific elements of the statute. Furthermore, Olympia has summarized forty-nine alleged instances of price discrimination in its Pretrial Statement, asserting that these "relate to contract work with respect to which Olympia and Standard were in direct competition."[32] This allegation is directly contradicted by the only relevant evidence on the issue. Specifically, of these forty-nine instances, only six represented situations in which

---

**27.** Deposition of William J. Manion, taken on June 2, 1977. Tr. 126.

**28.** R. Vol. 1 D. 1.

**29.** R. Vol. III D. 63.

**30.** III Manion deposition (1977) Tr. 112–114, 127–129, II Manion deposition (1977), Tr. 23–24.

**31.** Olympia's Second Amended Pretrial Statement, ¶ 55.

**32.** Olympia's Second Amended Pretrial Statement, ¶ 32.

Olympia and Standard made roughly contemporaneous purchases of similar goods from Celotex at different prices.[33] And, in those six instances, it is undisputed that Standard purchased materials from Celotex only after it had been awarded a roofing job. Based upon these facts, and upon the definition of a violation under the Robinson-Patman Act, no such violation is implicated. As previously stated, the Act protects purchasers in competition with one another at the time of the purchases; it is irrelevant that the companies may have entered into competitive bidding, or that the successful bidder was ultimately able to obtain prices below those offered to its competitors in the bidding process. *M.C. Manufacturing Co., Inc. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1066–1068 (5th Cir.1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976).

■ Additionally, even if Olympia had succeeded in showing that these six instances of "discrimination" constituted contemporaneous purchases of similar goods at different prices, the claim still could not rise to the level of a violation of the Robinson-Patman Act. A simple mathematical calculation reveals that Olympia paid between $150 and $235 more than Standard did for the same materials. Olympia's expert agreed that price differential in the amount of $1,000.00 was "definitely" de minimus.[34] As previously stated, the Robinson-Patman Act is only violated where the effect of price discrimination may be to substantially lessen competition. It is inconceivable that the de minimus price differential at issue could be said to have such a substantial, if any, effect on competition. *See*, e.g., *Hanson v. Pittsburgh Plate Glass Industries, Inc.*, 482 F.2d 220, 224 n. 8 (5th Cir.1973), *cert. denied*, 414 U.S. 1136, 94 S.Ct. 880, 38 L.Ed.2d 761 (1974).

It should be noted at this juncture that Olympia has apparently sought to reserve the right to present additional instances of price discrimination.[35] Nonetheless, the time to have presented such further evidence would have been in opposition to the motions herein, particularly since Olympia has had over seven years in which to discover relevant evidence on the issue and to compile this information.

■ As defendant points out, at a trial of this matter, based upon the undisputed facts, Olympia would fail to make out a prima facie case on the issue of price discrimination. Moreover, and more importantly for purposes of summary judgment herein, Celotex has established by uncontroverted evidence that any discriminatory price was extended in good faith to meet a lower competitive offer. Section 2(b) of the Robinson-Patman Act 15 U.S.C. § 13(b), has been interpreted to afford an absolute defense to a charge of violating § 2(a) of the Act, 15 U.S.C. § 13(a) where the defendant shows that lower prices were extended in good faith to meet an equally low price of a competitor. *FTC v. Sun Oil Co.*, 371 U.S. 505, 513–514, 83 S.Ct. 358, 363–364, 9 L.Ed.2d 466 (1963). The Affidavits of Sam E. Brasher and W.W. LeGrow demonstrate that Celotex lowered its prices to individual roofers only when necessary to do so in order to meet a lower competitive offer, and only after a formal, detailed multi-tier system of verification.[36] The verification methods employed by Celotex exceeded even those suggested by Olympia's expert.[37] And, these methods fall well within the appropriate ones discussed by the Supreme Court in *United States v. United States Gypsum Co.*, 438 U.S. 422, 454–455, 98 S.Ct. 2864, 2882, 57 L.Ed.2d 854 (1978).[38] Indeed, this defense has been

**33.** Deposition of William J. Manion, taken on August 24, 1978. Tr. 186.

**34.** Cromartie deposition, Tr. 264.

**35.** Olympia's Second Amended Pretrial Statement, ¶ 32.

**36.** Affidavit of Sam E. Brasher ¶¶ 7–20; Affidavit of W.W. LeGrow ¶¶ 20–30.

**37.** Cromartie deposition, Tr. 245–252.

**38.** On the issue of the good faith, meeting-competition defense, the Supreme Court stated:
> "Given the fact-specific nature of the inquiry, it is difficult to predict all the factors the FTC or a court would consider in appraising a seller's good faith in matching a competing offer in these circumstances. Certainly, evi-

sustained based upon less comprehensive schemes than that employed by Celotex for verification. *See,* e.g. *Great Atlantic & Pacific Tea Co. v. FTC,* 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979); *Jones v. Borden Co.,* 430 F.2d 568 (5th Cir.1970); *Callaway Mills Co. v. FTC,* 362 F.2d 435 (5th Cir.1966). The Supreme Court recently set forth the elements of this defense, as follows:

> "In summary, the meeting-competition defense requires the seller at least to show the existence of facts that would lead a reasonable and prudent person to believe that the seller's lower price would meet the equally low price of a competitor; it also requires the seller to demonstrate that its lower price was a good faith response to a competitor's lower price." *Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 103 S.Ct. 1282, 1297, 75 L.Ed.2d 174 (1983).

Celotex has established this defense based upon uncontroverted evidence. Olympia has asserted no substantiated facts to put the meeting-competition defense at issue, as it must do in order to defeat summary judgment on its price discrimination claim. Olympia's president conceded that he has no information concerning (1) what Celotex products Olympia bought or attempted to buy at which prices and at what times, (2) whether Celotex was actually meeting competitive offers when it extended price discounts to other roofers, and (3) whether Celotex attempted to verify competitive prices.[39] Nor has Olympia provided the Court with any evidence to create an issue of fact on its price discrimination claims. Under circumstances such as these, summary judgment is appropriate. *Jones v. Borden Co.,* 430 F.2d 568, 572 (5th Cir.1970).

We note that this claim is also subject to summary judgment for the reason to which we previously alluded, i.e., failure to show any actual injury and damage. Olympia has calculated its alleged damage from price discrimination on the basis of an average differential of 5% between the cost it and Standard paid for Celotex materials. Olympia has then projected the effect upon its business, both in terms of profits and increased business, based upon the hypothetical premise of Olympia being granted an average 5% price reduction.[40] This approach is not a proper method for proving injury and damage under the Robinson-Patman Act. *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562–563, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981); *Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d 575, 577 (5th Cir.), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). Assuming a violation of the Act has been shown, damages must be proven rather than presumed on the basis of the price differentials, since proof of actual injury is a prerequisite to recovery. *Id.* As previously stated, Olympia has come forth with nothing but its conclusory allegations of injury and damage, based upon improper assumptions. Furthermore, Olympia's calculation of alleged damages is premised upon the assumption that the allegedly unlawful price discrimination will be extended to Olympia, as well as to Standard. This assumption is unacceptable in actions such as the present one. *M.C. Manufacturing Co. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1063–1065 (5th Cir.1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976).

*(2) Sherman Act*

Under Section 1 of the Sherman Act, 15 U.S.C. § 1, "[e]very contract, com-

---

dence that a seller had received reports of similar discounts from other customers ... or was threatened with a termination of purchases if the discount were not met ... would be relevant in this regard. Efforts to corroborate the reported discount by seeking documentary evidence or by appraising its reasonableness in terms of available market data would also be probative as would be the seller's past experience with the particular buyer in question." 438 U.S. at 454–455, 98 S.Ct. at 2882, [citations omitted.]

**39.** Manion deposition (1978), Tr. 55–62, 69–72, 86–88, 91–93, 108–111, 115–116, 133, 136.

**40.** Olympia's Second Amended Pretrial Statement, ¶ 55.

bination ... or conspiracy in restraint of trade or commerce ... is ... illegal." The conspiracy issue will be specifically dealt with in a separate discussion. However, suffice it to say that this claim suffers from many of the same deficiencies addressed above. Primarily, the claim is deficient for plaintiffs' failure to produce evidence to create a triable issue of fact as to actual injury and damage. *See*, e.g. *M.C. Manufacturing Co., Inc. v. Texas Foundries, Inc.*, 517 F.2d 1059 (5th Cir.1975), *cert. denied* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976). Under the *Texas Foundries* rationale, Olympia would have to show not merely that Celotex conspired to drive Olympia out of business by extending discriminatory prices to its competitors, but also that (1) its competitors were awarded jobs, (2) the competitors received unjustified discounts, and (3) Olympia was the next lowest bidder. There are not even the barest of factual allegations, or inferences therefrom, in Olympia's Pretrial Statement to support such a conclusion.

### F. Tying

▮ Olympia alleges that buyers were "coerced" into buying Celotex's building materials in order to obtain the more desirable bonds, and thus, Celotex tied roofing materials to roofing bonds in violation of § 3 of the Clayton Act, 15 U.S.C. § 14.[41] The Fifth Circuit has identified four characteristics of an illegal tying arrangement, as follows: (1) two separate products, the tying product and the tied product, (2) sufficient economic power in the tying market to coerce purchase of the tied product, (3) involvement of a not insubstantial amount of interstate commerce in the tied market, and (4) anticompetitive effects in the tied market. *Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir.1974). More recently, the Supreme Court has discussed the elements of a tying arrangement, and particularly, the necessity that there be two separate products, in the case of *Jefferson Parish Hospital District No. 2 v. Hyde*, —— U.S. ——, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). The considerations on such a claim are whether two separate products were being sold that may be tied together, and, if so, whether the sellers used their market power to force their purchasers to accept the tying arrangement. *Id.* 104 S.Ct. at 1561. Whether two distinct products are involved "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Id.* at 1562. A tying arrangement cannot exist unless two separate product markets have been linked. *Id.* at 1563. We find that the principles enunciated in *Hyde* are dispositive of the instant case. Olympia has not alleged, nor can it conceivably claim, that Celotex's materials and its bonds are two separate and distinct products derived respectively from two separate and distinct product markets. There is simply no market for roofing bonds in and of themselves, absent bonded materials. Furthermore, and as previously discussed, Olympia has not even defined the relevant markets sufficiently to state such a cause of action. Summary judgment on the tying claim is appropriate.

### G. Conspiracy

▮ Olympia's factual allegations do not state a viable claim of conspiracy, and the record is completely devoid of any evidence to support this claim. Olympia apparently relies on its contention that Celotex "secretly" communicated to Standard that Olympia would not be accorded approved status at the same time Celotex published and circulated its current Approved Roofer list, from which Olympia had been excluded.[42] Celotex had produced sworn affidavits denying the existence of any conspiracy between it and Standard.[43] Olympia has produced nothing in response

---

**41.** Olympia's Second Amended Pretrial Statement, p. 53.

**42.** Olympia's Second Amended Pretrial Statement, ¶¶ 47, 49.

**43.** Brasher Affidavit ¶¶ 7, 34; LeGrow Affidavit ¶¶ 16–19.

thereto to create a triable issue of fact on the claim. The Fifth Circuit has consistently held that summary judgment is appropriate where a plaintiff rests on its mere allegations and fails to produce substantial evidence showing the existence of a genuine issue of fact, as required by Rule 56(e) of the Federal Rules of Civil Procedure. *See*, e.g., *Parsons v. Ford Motor Co.*, 669 F.2d 308, 313 (5th Cir.1982), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982); *Southern Concrete Co. v. United States Steel Corp.*, 535 F.2d 313, 318 (5th Cir.1976); *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389, 395–397 (5th Cir.1976); *Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778, 782 (5th Cir.1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975). Considering the several years of the pendency of this litigation, "[t]he mere hope that evidence may turn up to support a conspiracy does not suffice to warrant a trial." *Bougeois v. A.B. Dick Co.*, 386 F.Supp. 1094, 1097 (W.D.La.1974).

### III. Motion of Standard for Summary Judgment

For the reasons set forth relative to Olympia's motion for summary judgment, Standard's motion should, likewise, be granted. We shall not belabor and reiterate these reasons. However, we note certain additional points warranting summary judgment in favor of Standard.

### A. Monopolization and Attempted Monopolization

■ Subparts II B, C and D are incorporated herein by reference. Additionally, the affidavit of Pierre F. Carriere further supports the conclusion that the relevant markets have not been accurately or sufficiently defined by Olympia. Olympia's reliance upon gross sales solely to New Orleans roofers necessarily assumes that the market for roofing jobs in New Orleans is restricted to roofing contractors actually located in New Orleans, and further as-

sumes that those contractors who are located in New Orleans do not perform jobs outside the New Orleans area. Both of these assumptions are unsupported by the facts and evidence, and are specifically refuted by the affidavit of Mr. Carriere. That affidavit indicates that although Standard is and always has been located in New Orleans, it has done extensive business throughout the State of Louisiana, and in the adjoining States of Mississippi and Texas, as well as in Georgia. Accordingly, the figures which Olympia has compiled as to Standard's purchases from Celotex and Johns-Manville include purchases by Standard not only for work which Standard performed in the New Orleans area, but also for work which Standard performed throughout Louisiana and in other states. As is further indicated and unrefuted by Carriere's affidavit, non-local roofing contractors constitute a significant segment of competitors in the New Orleans area. Yet, this fact has been ignored by Olympia in delineating the relevant geographic markets and in its allegations of market share.

### B. Price Discrimination

■ Subpart II E is incorporated herein by reference. Furthermore, Standard has established, based upon unrefuted evidence, that it legitimately shopped for the best available price on roofing materials, and that it never received a price known or believed to be improper or discriminatory against a competitor.[44] In order to defeat summary judgment, Olympia would have had to come forward with evidence to create an issue of fact in this regard. This, Olympia has not done.

Accordingly, and for the foregoing reasons, it is ordered that the motions of defendants for summary judgment, dismissing plaintiffs' claims, be and they are hereby GRANTED. The clerk of court is directed to enter judgment in accordance herewith.

---

**44.** Affidavit of Pierre F. Carriere.

APPENDIX # 1

OLYMPIA COMPANY, INC. and
OLYMPIA ROOFING
COMPANY, INC.

VS.

THE CELOTEX
CORPORATION, ET AL.

CIVIL ACTION NO. 76–373

SECTION "A" (3)

JURY DEMANDED

SECOND AMENDED PRETRIAL
STATEMENT

TO THE HONORABLE COURT:

Plaintiffs present this Second Amended Pretrial Statement in conformance with order of the Court dated December 15, 1982.

A. *Narrative Statement of Facts Proposed to be Proved by Plaintiffs.*

1. Plaintiffs Olympia Company, Inc. and Olympia Roofing Company, Inc. (Olympia) are Louisiana corporations with their principal place of business in Metairie, Louisiana.

2. The Defendant, The Celotex Corporation (Celotex) is a Delaware corporation, having its principal place of business outside the State of Louisiana, which does business in the State of Louisiana on a regular and systematic basis.

3. The Defendant, Standard-Taylor Industries, Inc., (S–T) is a Delaware corporation having its home office and principal place of business in Montgomery, Alabama; it was formerly Standard Roofing Co., Inc., and is a foreign corporation doing business in the State of Louisiana, on a regular and systematic basis.

4. Standard Roofing Company of New Orleans, Inc. (S–NO) is a Delaware corporation, having its home office and principal place of business in Montgomery, Alabama; it was formerly part of Standard Roofing Co., Inc., and is presently a division of Standard-Taylor Industries, Inc., and is a foreign corporation which does business within the State of Louisiana on a regular and systematic basis.

5. Defendant Robbins Taylor is a resident of Montgomery, Alabama, and is the Chief Executive Officer of Standard-Taylor Industries, Inc., and one of the principal executive officers of Standard Roofing Company of New Orleans, Inc.

6. Defendant Pierre F. Carriere is a resident of the City of New Orleans, State of Louisiana, and is the Chief Executive Officer of Standard Roofing Company of New Orleans, Inc.

7. Olympia was in the roofing contracting business since its inception in 1926 until it recently became inactive.

8. From its inception, Olympia purchased roofing materials from either the Celotex Corporation or its business predecessors (Carey Company and Barrett Company).

9. In securing roofing jobs, and furnishing roofing services and materials, Olympia has been in direct competition with Standard-Taylor Industries, Inc., and Standard Roofing Company of New Orleans, Inc. (hereinafter collectively referred to as Standard) and other contractors, in the union bonded roofing market (hereinafter defined).

10. For many years, Olympia was on Celotex's list of approved roofers for the State of Louisiana, which enabled it to secure Celotex's roofing and bond protection for any roofing assembly installed by Olympia and incorporating materials purchased from Celotex.

11. Under a roofing bond, the roofing contractor alone is responsible for the maintenance of the roof for the first two years, without fee.

12. At the end of the two years, the roof is reinspected and, after any necessary repairs have been made, the manufacturer assumes responsibility for repairs occasioned by ordinary wear and tear during the remaining term of the bond.

13. The manufacturer receives a fixed amount for the bond, similar to an insurance premium, and neither the premium nor the penal sum is negotiable.

14. Both the premium and the penal sum are based on a fixed amount per 100 square feet of the roof's surface.

15. A roofing bond is not a guarantee, nor is it a warranty of the work of the roofer.

16. In no event can the manufacturer's obligation exceed the penal sum of the bond.

17. The significant difference between bonds offered by different manufacturers is the term of the coverage available and the amount of the premium, which is paid by the owner of the roof.

18. The Celotex bonding policy is the most liberal and consumer oriented, in that it offers a 20 year bond for a penal sum of either $20.00 or $10.00 per 100 square feet of covered surface, plus a service guarantee of 10 years, with an option of an additional 10 year renewal.

19. During the early 1970's, GAF reduced its bond coverage by one-half, and thereafter, at times pertinent to this suit, offered a 10 year bond for a penal sum of either $20.00 or $10.00 per 100 square feet of surface coverage and a surface guarantee of only 5 years with an option of an additional 5 year renewal.

20. During the pertinent period, Johns-Manville offered a 20 year or 15 year bond for a penal sum of either $20.00 or $10.00 per 100 square feet of area coverage, but no service guarantee.

21. During the pertinent period, Koppers dealt only in coal tar pitch products, which are more expensive than other roofing products, thus considerably limiting its position in the roofing market, and its bond for the coal tar pitched products did not equal the bond extended by Celotex.

22. Beginning approximately in 1970, the Defendant Celotex began an aggressive program designed to secure increase sales of roofing materials to union bonded contractors, stressing the roofing bond protection that it furnished.

23. At that time, only Johns-Manville and Celotex offered a bond giving a 20 year term and a service guarantee of 10 + 10, i.e., a 10 year term with an option of a 10 year renewal, for a specified penal sum per "square", i.e., per 100 square feet of roofing.

24. By the year 1974, Johns-Manville had reduced its bond coverage protection, and Celotex thus became possessed of a unique bond program.

25. Because of its aggressive sales and bond policies, and its unique bond protection, the Defendant Celotex achieved and has maintained a dominant and monopolistic position in the market for sales of roofing materials for use on union bonded roofing jobs in the New Orleans area throughout the 1970's.

26. Celotex's market share of this market exceeds 60%.

27. Celotex employs certain criteria in determining which roofer is to include on its "approved" roofer list for the purpose of providing bond coverage.

28. These criteria are: (a) Celotex must be satisfied that the roofer possesses the requisite expertise in applying Celotex materials; (b) the roofer must maintain this expertise by using Celotex products on a "reasonably frequent" basis; and (c) Celotex must be satisfied with the roofer's credit standing "at all times."

29. Celotex professes that if a roofer meets these standards he may become an approved roofer by entering into an approved roofer agreement.

30. The agreement provides that Celotex will issue a bond covering the roof that (a) is installed and repaired by an approved roofer, (b) using Celotex materials, (c) applied in accordance with Celotex published specifications.

31. If Celotex's inspection reveals that the roof does not meet these specifications, it will not issue a bond. Celotex has reserved to its arbitrary determination whether a roofer possesses the requisite expertise and credit standing, and has increased its sales by requiring that a roofer maintain this "expertise" by using Celotex products on a frequent basis, and by customarily deleting roofers from its approved roofer

list if they have not made purchases from Celotex within a 12 month period.

32. During the pertinent period, Celotex regularly and systematically extended to Standard discriminatory prices on roofing materials. Specifically, Celotex granted Standard the following discriminatory prices not received by Plaintiffs or other competing roofing companies:

| | Date(s) | Record[1] | Product(s) | Price Differential[2] | Duration |
|---|---|---|---|---|---|
| (1) | 09/16/68 | (c) 350-42763 | Spec. felt | 10% + 5% | Until cancelled, superceded or extended to the trade. |
| | 09/23/68 | (c) 350-7444 | " | 5% + 7% | |
| (2) | 04/30/69 | (c) 350-9836 | asphalt-steep; | 2.00 per unit | 01/14/71 |
| | | (c) 350-9836 | metal asphalt anchor bond | | |
| (3) | 04/30/69 | (c) 350-J-8279 | 1" Fiberboard | 4.00 per unit | Until 6/30/69 |
| | | (c) 350-21032 | celotherm | 2.00 per unit | Until cancelled, superceded or extended to the trade. |
| (4) | 04/16/69 | (c) 350-J-3210 | celotherm | 2.00 per unit | Until 8/31/69 |
| | 09/23/69 | (c) 350-J-3844 | Vapor bar | ?[3] | Until 10/15/69 |
| | 10/31/69 | (c) 350-J-4081 | 1" IMP RFG Ins. | 2.00 per unit | Until superceded |
| | 06/14/70 | (c) 350-21098 | 2d Base sheet | 10% | Until superceded |
| | | (c) 350-21097 | #15 Perf. felt | | |
| (5) | 08/24/70 | (s) P.O.1677 | 2" Celotherm | 8.00 per unit | Duration of order |
| (6) | 10/07/69 | (c) 350-J-4755 | Vapor bar and coated felt | ?[3] | 3/23/70 |
| | 03/23/70 | (c) 350-J-4755 | " | ?[3] | Until 7/31/70 |
| (7) | 05/06/71 | (c) 350-E-1854<br>(c) 360-3154<br>(c) 360-3155 | Bond ply | 10% + 5% | 5/30/71 |
| (8) | 01/26/70 | (s) P.O.1966 | 48# Base sheet 15# Asbestos felt | 10% | Until 3/31/70 |
| | 03/04/70 | (s) P.O.1604 | Celotherm | ?[3] | |
| | 01/26/70 | (s) P.O.1965 | Celotherm | ?[3] | |
| | 08/24/70 | (c) 350-21053 | Celotherm | ?[3] | |
| (9) | 01/02/70 | (c) 350-21088 | R1-4 #15 & #30 felt | 10% + 5% | Until 1/20/70 |
| | 01/27/70 | (c) 350-J-4497 | " | 10% + 5% + 5% | Until 3/9/70 |
| (10) | 03/24/70 | (c) 350-J-4769 | 1" Celotherm | ?[3] | Until 3/24/70 |
| | 03/24/70 | (c) 350-J-4780 | Celotherm | ?[3] | Until 5/30/70 |
| (11) | 09/01/70 | (c) 350-E-7703 | #15 felt | 5% + 5% + 5% + 5% | 2/28/71 |
| | 03/01/70 | (c) 350-E-1716 | #15 felt | | 4/15/71 |
| (12) | 04/30/70 | 350-21095 | various | .03 per roll | Until superceded, etc. |
| (13) | 06/10/70 | J-5146 | #15 & 30 Perf. felt | .03 per roll | Until 11/30/70 |

1. Records were taken from files of either Celotex or Standard, identified by (c) and (s).

2. Represent amount of discrimination, i.e. difference in price accorded Standard and price given Olympia and others.

3. Amount of differential not reflected on instruments noted, to be calculated by use of current price list.

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

| | | | | | |
|---|---|---|---|---|---|
| (14) | 10/31/72 | (s) P.O.1182 | 43# base | .49 and .79 per roll | Until superceded, etc. |
| | 10/31/72 | (s) P.O.1182 | Asphalt felts | 75% + 5% | Until superceded, etc. |
| | 10/31/72 | (s) P.O.1182 | Asbestos flashing | 5% | Until superceded, etc. |
| (15) | 05/22/72 | (s) P.O.1326 | Asbestos base | 5% + 5% | Until superceded, etc. |
| (16) | 10/06/72 | (s) P.O.1320 | 43# base sheet & 33# coated felts | 5% + 5% | Until superceded, etc. |
| (17) | 01/ /72 | P.O.1770 | 43# base sheet | 5% + 5% | Until superceded, etc. |
| (18) | 11/22/72 | (c) Inv.82–2783 | coated felt | 5% + 5% | Until superceded, etc. |
| (19) | (N/A—questions actions during price "freeze.") | | | | |
| (20) | 10/29/73 | (s) P.O.1026 (c) 350–E–573 | Asbestos Base sheet 15# Asbestos felt | 3% or $.30 per unit | Eff. 6/11/73 until further notice |
| (21) | 06/13/72 | (s) P.O.1335 | Asbestos products | 5% | Until superceded, etc. |
| (22) | 09/11/72 | Inv.82–2305 | Various products | 5% + 5% | Until superceded, etc. |
| (23) | 09/01/72 | (c) 82–225 (s) P.O.1345 | Various products | 5% + 5% | Until superceded, etc. |
| (24) | 11/31/72 | (c) 350–16949 (c) 350–13651 | 15# Asphalt | 5% | Until superceded, etc. |
| (25) | 11/11/70 04/12/72 | (c) 350–7145 (c) 350–13660 | Specification felt | 5% + 2% | Until 4/30/71 |
| (26) | 01/03/72 | (c) 350–24861 | 15# Asphalt | (N/A—reflects price increase; included to show false and misleading price information—quoted price inconsistent with current price list.) | |
| (27) | 02/02/72 | (c) 82–864 | #15 flt perf blk shd 2 | N.O. tax & Orleans Parish tax | Until superceded, etc. |
| | 09/28/71 | (s) P.O.1725 | Deep asphalt | $2.20 per unit (4½% discount + freight) | Until superceded, etc. |
| (28) | 11/24/70 01/26/71 | (c) 350–7146 (c) 350–7162 | 1" insulation 1.4" insulation | 8% 18% | Until superceded, etc. Until superceded, etc. |
| (29) | 10/18/72 | (s) P.O.1733 & (c) Inv.82–730 | Asphalt | $53.00 per unit | Until 12/31/71 |
| | 10/18/71 | (s) P.O.1733 & (c) 350–16941 | Carton asphalt & asbestos | 5% + 5% + 5% | Until 12/31/71 |
| (30) | 03/19/73 | (c) Inv.39–04532 (c) P.O.1167 | Commodity 37142 | 5% + 5% | Until superceded, etc. |
| (31) | 02/07/73 | (c) 350–35759 (c) Inv.39–05340 (s) P.O.1139 | Commodity Nos. 73109 & 73085, asbestos products | 5% | Until superceded, etc. |
| (32) | 12/04/72 05/30/73 | (s) P.O.'s 1155 & 1175 Inv. 86–23950 | Commodity Nos. 74312 & 74418 | 5% | Until superceded, etc. |

| (33) | 06/21/73 | (s) Inv.86–23978 | Commodity No. 74312 | 3% | Until superceded, etc. |
|---|---|---|---|---|---|
| (34) | 06/25/73 | (c) Inv.86–24237, (s) P.O.1276 | Commodity No. 74312 | 3% | Until superceded, etc. |
| (35) | 07/08/73 | (c) Inv.82–04001, (s) P.O.1003 | Commodity No. 74312 | 3% | Until superceded, etc. |
| (36) | 09/04/73 | (c) Inv.86–0015 | Various products | 10% | Until superceded, etc. |
| | 04/17/73 | (c) 350–29479 | Commodities 74312, 74418, & 72143 | 5% + 5% | Until superceded, etc. |
| (37) | 09/19/73 | (s) P.O.1121, (c) Inv.No. 3900790 | Commodity No. 73142 Commodity No. 73109 | 5% + 5% 9% | Until superceded, etc. Until superceded, etc. |
| (38) | (N/A—Compares Celotex, Inv. No. 39–00202 to Olympia on Commodity No. 73109) | | | | |
| (39) | 10/02/73 | (c) Inv.No. 3900790 | Commodity No. 73142, 73051 | 2% to 3% | Until superceded, etc. |
| (40) | 10/08/73 | (s) P.O.1019 | Asphalt products | 5% + 5% | Until superceded, etc. |
| (41) | 07/30/73 | (s) P.O.1006 (c) Inv.82–00585 | Asphalt products | 2% to 3% | Until superceded, etc. |
| (42) | 03/12/77 | (s) P.O.1063 (c) Inv.82–0999 | Asbestos & felt products | 8½% | Until superceded, etc. |
| (43) | 02/01/74 | P.O.1081 | Various products | 5% + 5% | Until superceded, etc. |
| (44) | 02/01/74 | P.O.1080 | Various products | 5% + 5% | Until superceded, etc. |
| (45) | (N/A—refers to Carriere letter to Curtis, August 2, 1974) | | | | |
| (46) | 10/14/74 | Inv.39–07544 | Asbestos products | 5% | Until superceded, etc. |
| | 12/16/74 | Inv.39–08408 | Asbestos products | 5% | Until superceded, etc. |
| (47) | (N/A—refers to correspondence between Celotex and Standard) | | | | |
| (48) | 05/20/75 | (c) 350–79977 (c) 350–53843 (s) P.O.1371 | Asbestos felt | 5% + 5% | Until superceded, etc. |
| (49) | 11/17/76 | (c) Inv.39–18442 | Vapor bar; Carey Tread | $120.85 | N/A |

The foregoing instances of discrimination relate to contract work with respect to which Olympia and Standard were in direct competition, and are noted in Plaintiffs' Exhibit 241. P.Ex. 241 will be revised to reflect a summarization of information from pertinent documents, as reflected above. As so revised, it is Plaintiffs' intention to offer the instrument in evidence. However, as hereafter noted, the Exhibit does not purport to describe all instances of discriminatory pricing extended to Standard by Celotex.

33. In most instances, the extension of the discriminatory pricing was implemented through the covert use of forms known as "350's" and "360's", some of which are referenced above.

34. Ostensibly the "350's" were forms employed by Celotex to verify competitive

prices offered to roofing contractors by roofing material suppliers on particular orders or for particular jobs, and to indicate the extension of a discounted price to "meet" the competitive offer. The "360's" supposedly were used to grant a lower price to all customers (roofing contractors) in a particular area. When granted, the "360's" at times had the effect of equalizing prices extended to other contractors with discriminatory prices previously given to Standard. However, the non-favored contractors were not aware of this, and were not even aware of the term "360," or its significance.

35. In truth, the forms were not employed in good faith, but, to the contrary, were sham artifices used to mask the granting of discriminatory prices to Standard. As shown by P.Ex. 252 Standard Roofing of New Orleans received a total of 183 "350's" which were revealed in the process of discovery of records in Tampa, Florida. Additionally, 74 more "350's" were furnished, and are identified on P.Ex.'s 252A and 250B. A check of invoices during the discovery in Tampa, Florida, revealed an additional 39 "350's", which were not produced. These are listed on P.Ex. 252C. This brings the total "350's" price allowances received by Standard to 296. By comparison, P.Ex. 253 shows that other competing roofing companies received virtually no "350's". Taylor Brothers received 5, Vicinelli received 1 and Ellis received 3. Exhibit 185 shows that Olympia received a total of 16 "350's". Eight of those were received during the period 1968–1969. Four were received in 1971. No "350's" were issued from March 31, 1971, forward. Olympia was unaware that any "350's" were issued by Celotex in connection with the purchase of any materials by Olympia, and/or that it was the beneficiary of any "350" consideration. It also appears that if other competing roofing contractors received "350" consideration, they were not aware of it, as evidenced by affidavit and proposed testimony of John D. Robertson, Jr., former President and Chief Operating Officer of Dixie Roofing & Sheetmetal Works, Inc., who states that he knew nothing of any competitive allowance request procedure or competitive pricing procedure offered or granted by Celotex.

36. The systematic extension of discriminatory prices to Standard allowed Standard to achieve cost advantages enabling it to secure a dominant position in the union bonded roofing contracting market. That market was serviced, at pertinent times by four companies—Celotex, GAF, Johns-Manville, and Koppers. From and after the year 1974, Celotex maintained a dominant position in the market. During the early 1970's GAF reduced its bond coverage by one-half, thereby rendering it essentially non-competitive. Koppers dealt only in coal tar pitch products, which are more expensive than other roofing products, and offered a bond only for coal tar pitched products. The bond offered did not equal the bond extended by Celotex. Johns-Manville reduced its bond coverage by eliminating any service guarantee, by the year 1974. Therefor, from and after the year 1974, the bond program offered by Celotex was unique in the New Orleans metropolitan market. It offered a 20 year bond for a penal sum of either $20.00 or $10.00 per 100 square feet of covered surface, plus a service guarantee of 10 years, with an option of an additional 10 year renewal. No definite figures are available to Plaintiffs regarding the relative share of bond protection afforded by each of the four named companies, but based on sales figures that are available and witnesses' observations of the industry from and after 1974, Defendant Celotex, because of its unique bonding program, achieved a share of the market for sale of roofing materials to bonded union roofing contractors of over 6090. With respect to contracting for the furnishing of bonded union roofing services, Plaintiffs have complied from their own records and records obtained during the course of discovery the information as to Celotex sales contained in Plaintiffs' Exhibits 134, 135, 136, 137, 138, 143, 144, 145, 146 and 259. Plaintiffs have also obtained information regarding Johns-Manville sales to roofing contractors and wholesalers in

the New Orleans metropolitan area, reflected by Exhibit 248. This information is summarized, in chart form, in Exhibits attached hereto. This information is partial, and therefore does not reflect precise market shares of the competing roofing contractors. However, based on this information, and the proposed testimony of witnesses' observations of the industry, from and after 1974, the Defendant Standard Roofing of New Orleans achieved a share of the union bonded roofing contracting market in the New Orleans metropolitan area in excess of 50%. The remainder of the market was divided between those competitors named in paragraph 57 of this Second Amended Pretrial Statement. Though the information in the attached charts is partial, it supports the conclusion that the market was divided in the approximate percentages reflected by sales of roofing materials to the competitors.

37. The lower prices resulting from the "350's" and "360's" were extended secretively, and the resulting discriminatory pricing was not made known to Olympia or other roofing contractors and, during the pertinent period, Olympia and other roofing contractors were not given the opportunity to achieve pricing comparable to that extended to Standard.

38. ...

39. ...

40. ...

41. ...

42. ...

43. ...

44. ...

45. ...

46. ...

47. Celotex secretly communicated to Standard that Olympia would not be accorded "approved" status ...

48. ...

49. Concurrently, Celotex, through its Southwest Division Manager, Legrow, prepared, published and circulated its "current" list of approved bonded roofers for the State of Louisiana, which excluded Olympia.

50. No written notice of termination of Olympia's approved status had been given, and there was no cause or justification for withholding "approved" status from Olympia.

51. ...

52. ...

53. ...

54. ...

55. Olympia was substantially damaged as a result of the discriminatory pricing, and the dominant position achieved by Standard in the market for roofing contracting services in the New Orleans area. The records obtained through discovery, and discussed herein, indicate an average price differential of 5% in the cost paid for materials purchased from Celotex by Olympia and Standard. This materially inhibited Plaintiffs' ability to compete for jobs, particularly since virtually all union bonded roofing contracting jobs are awarded on a bid basis. During the damage period 1972 through 1976, Olympia's purchases of roofing materials affected by the discrimination amounted to $763,153.00. If it be assumed that had Olympia been granted an average 5% price reduction, and it be further assumed that Olympia pocketed that price reduction in the form of profits, its loss for the period 1972 through 1976 would be $38,157.65. However, if it be assumed that Olympia used the 5% price reduction as a basis for more vigorously competing for awards of jobs in the market, in reasonable probability Olympia's participation in the market would have increased. Based on this factor, and Olympia's history in the market, Olympia could easily have increased its total "sales", i.e. gross revenues realized from rendering roofing contracted services by 40%. During the period 1972–1976, Olympia's sales actually amounted to $2,704,539.00, with a net pretax profit of 1.06¢ per dollar of sales. Increase in sales, assuming equality of pricing and use of reduced prices to compete in the market, would amount of $1,081,816.00.

Plaintiffs propose to offer proof of damages using this basic methodology and employing a ten year "straight-line" projection of sales and loss net profits for a "future" period of ten years from and after 1976.

56. Contracting for the furnishing of bonded union roofing services within the geographical area known as metropolitan New Orleans is a separate market or submarket, distinct from the total roofing market in the geographical area, which has peculiar characteristics, including:

(a) The initial determination whether a roofing job will be union and/or bonded is controlled by architectural specifications;

(b) These specifications are influenced in large part through the roofers industrial promotion program, an integral part of the bargaining agreement between the union and roofing contractors;

(c) The contractors contribute 25 cents per man per working hour to the program;

(d) The executive director of the program runs the bid depository, and prepares bid forms, to be used in submission of bids by contractors;

(e) He also serves as an industrial promotion man making contact with architects and securing specifications designed to require union labor;

(f) Specifications which require "prevailing wage to be paid" insure that a job is performed with union labor;

(g) Union roofing work is primarily commercial, and virtually all commercial jobs over $250,000.00 in value are union jobs, and are bonded;

(h) There is no competition between union and non-union contractors where bonds and "prevailing wage" are required;

(i) Union contractors, in order to compete effectively in the market, must possess the power to apply for and obtain roofing bonds from suppliers of roofing materials.

57. In addition to the Defendant Standard and the Plaintiff Olympia, other companies which have competed in this market, since the year 1970, include Dixie Roofing Company, Inc., Ellis Roofing, Inc., Taylor-Seidenback, Inc., Holzer Sheetmetal, Inc., Edward Chassinol Roofing, Orleans Roofing and Materials, and Delta Decks, Inc.

58. A second market consists of sales of roofing materials to union bonded roofers in the New Orleans area.

(a) The basic roofing materials consist of flashing materials (which is a laminated felt paper product), insulation, (which may be inorganic or fiberglass), paper and felt (which can be treated with pitch or asphalt), plastic sheets, adherent material (which is ordinarily asphalt, pitch (tar), or putty (a cut-back asphalt) and shingles (which are asphalt).

(b) Generally, roofing materials are categorized as either "tar" or "asphalt."

(c) In selling materials to union roofers for commercial application, suppliers furnish bonds to customers through approved roofers, i.e., the roofing contractor has to be approved before a bond will be furnished.

(d) Because of the common requirement of bonded roofs on larger commercial jobs, the ability to secure a bond is an indispensible requirement for the union contractor in securing jobs.

(e) Likewise, the furnishing of bonds is an indispensible element in the sale of roofing materials to union bonded roofing contractors in the New Orleans area.

(f) Defendant Celotex sells both asphalt and tar roofing materials, and bonds both tar and asphalt roofs.

(g) GAF, Inc., sells shingles and asphalt roofing materials, no insulation materials, and bonds asphalt roofs only.

(h) Johns-Manville sells shingles and insulation, and bonds asphalt products only.

(i) Koppers Company sells and bonds only tar products.

(j) Fiberglass markets a taped insulation system that has a minor portion of the roofing market.

(k) Bird & Son markets primarily shingle and asphalt products, with its primary sales being in the residential field.

(*l*) Each manufacturer will furnish a bond, and approve a contractor for bonding, only if its products are used in the construction of the roof, and thus the furnishing of the bond is inseparably tied to the sale of materials by the manufacturer to the union roofing contractor.

## LIST OF WITNESSES AND DOCUMENTS

Plaintiffs expect to elicit testimony from the following witnesses, and to offer the following documents, in support of the facts set forth above.

### WITNESSES

1. *William J. Manion*, 401 Metairie Road, Metairie, Louisiana

### APPENDIX # 2

## OLYMPIA COMPANY, INC. and OLYMPIA ROOFING COMPANY, INC., Plaintiffs,

### versus

## THE CELOTEX CORPORATION, STANDARD–TAYLOR INDUSTRIES, INC., et al., Defendants.

### CIVIL ACTION NO. 76–373

### SECTION "A" (3)

### JURY DEMANDED

## RULE 3.9 STATEMENT OF MATERIAL FACTS

The Court's Order of May 14, 1980 specified in ¶ 38 that "the narrative statements of fact in the parties' Pretrial Statements shall serve as the Statements of Material Facts required by Local Rule 3.9." Accordingly, Defendant The Celotex Corporation ("Celotex") admits for the purpose of this Motion all narrative statements of fact in the Second Amended Pretrial Statement filed by Plaintiffs Olympia Company, Inc. and Olympia Roofing Company, Inc. ("Olympia").[1] Celotex also submits that the following facts as to which it contends there is no genuine issue to be tried may be material:[2]

1. Olympia neither purchased materials from nor placed orders with Celotex after October of 1973. (III Manion Deposition [1977], Tr. 112–14, 127–29; II Manion Deposition [1977], Tr. 23–24; Olympia's Answer to Celotex First Interrogatory No. 35(g) (filed May 18, 1978).)

2. Olympia has been able to identify only six instances in which Olympia and Standard made roughly contemporaneous purchases of similar goods from Celotex at different prices. (Manion Deposition [1978], Tr. 186.)

3. Olympia never requested a discount from Celotex or any other manufacturer, nor were discounts ever offered to Olympia by any competitors of Celotex. (Manion Deposition [1978], Tr. 43–46, 121, 126, 185.)

4. Olympia has no information whatsoever concerning (a) what Celotex products it attempted to buy at which prices and at what times, (b) whether Celotex was actually meeting lower competitive offers when it extended price discounts to other roofers, and (c) whether Celotex attempted to verify competitive prices. (Manion Deposition [1978], Tr. 55–62, 69–72, 86–88, 91–93, 108–11, 115–16, 133, 136.)

5. Celotex lowered its prices to individual roofers only when necessary to do so in order to meet a lower competitive offer, and only after a detailed and formalized multi-tier system of verification. (Brasher Affidavit ¶¶ 7–20; LeGrow Affidavit ¶¶ 20–30.)

---

1. A copy of the Narrative Statement of Facts in Olympia's Second Amended Pretrial Statement is attached as Appendix I. [See page 301, supra.]

2. The following abbreviated references are used herein: Deposition of Dr. W.J. Manion taken on August 24, 1978 = Manion Deposition [1978]. Deposition of Dr. W.J. Manion taken on May 31, and June 2, 1977 = Manion Deposition [1977]. Deposition of Dr. J.S. Cromartie taken January 5, 1984 = Cromartie Deposition. Deposition of Dr. P.W. Jeffress taken January 4, 1984 = Jeffress Deposition. Affidavit of S.E. Brasher = Brasher Affidavit. Affidavit of W.W. LeGrow = LeGrow Affidavit.

6. Celotex has never contracted, agreed, or conspired, through the use of the Approved Roofer list or otherwise, to (a) give one roofer lower prices than those extended to it competitors, or (b) to boycott or injure a roofer. (Brasher Affidavit ¶¶ 7, 34; LeGrow Affidavit ¶¶ 16–19.)

7. The sales data accompanying Olympia's Second Amended Pretrial Statement shows only Celotex sales to selected roofers in the New Orleans area, are incomplete, and support no conclusions whatsoever about Celotex's share of the relevant market. (Cromartie Deposition, Tr. 33–35, 62–69, 77–80, 148–49, 207, 266–72 & Exs. 5, 6; Jeffress Deposition, Tr. 79–83, 140–41 & Exs. 3, 4.)

8. Olympia did no roofing jobs equal to or over $250,000 in value in the period from 1972 to 1976. (III Manion Deposition [1977], Tr. 114–15; II Manion Deposition [1977], Tr. 75–77.)

9. No copy of the Approved Roofer Agreement between Celotex and Olympia has ever been found. (LeGrow Affidavit ¶ 7; Olympia's Answer to Celotex First Interrogatory No. 34(b) (filed May 18, 1978).)

10. An Approved Roofer Agreement is terminable at will. (LeGrow Affidavit ¶ 9.)

11. In late 1973, Celotex and Olympia engaged in a dispute involving the payment of bills. (III Manion Deposition [1977], Tr. 125–32; II Manion Deposition [1977], Tr. 6, 24–26.)

12. Celotex did not refuse to sell materials to Olympia, but rather insisted upon delivering them C.O.D. or to job-sites in order to preserve its lien rights. (III Manion Deposition [1977], Tr. 91–94, 112–14; II Manion Deposition [1977], Tr. 8–9, 23–24.)

13. As a result of the credit dispute, Olympia sued Celotex in the Civil District Court for the Parish of Orleans. (III Manion Deposition [1977], Tr. 43–44; II Manion Deposition [1977], Tr. 6; *Olympia Roofing Company, Inc. v. The Celotex Corporation, et al.*, No. 574–437 (filed June 10, 1974).)

14. Although it was customary for Celotex to delete roofers from its Approved Roofer list if no purchases were made within a 12-month period, it was also customary to notify roofers deleted for this reason, both as a courtesy and in order to allow them to be reinstated if they wished. (LeGrow Affidavit ¶¶ 9, 11.)

15. In early 1974, it was decided that alterations in Celotex's corporate structure made it necessary to update and revise existing Approved Roofer lists. (LeGrow Affidavit ¶ 5.)

16. Accordingly, new Approved Roofer Agreement forms were forwarded to roofing applicators by the appropriate Regional offices. (LeGrow Affidavit ¶ 6.)

17. An Approved Roofer Agreement was delivered to Olympia in January of 1974; however, Olympia refused to sign the Agreement because of the continuing credit dispute with Celotex, and did not execute and forward the Agreement to Celotex until February of 1975. (III Manion Deposition [1977], Tr. 133–36.)

/s/ Charles Kohlmeyer, Jr.
CHARLES KOHLMEYER, JR.
ERNEST L. EDWARDS
GEORGE FRAZIER
Lemle, Kelleher, Kohlmeyer & Matthews
21st Floor, Pan-American Life Center
601 Poydras Street
New Orleans, Louisiana 70130
Telephone: (504) 586–1241
Attorneys for Defendant The Celotex Corporation